IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| HUNT CONSTRUCTION GROUP, INC.,<br>    an Indiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>COBB MECHANICAL CONTRACTORS, INC.,<br>a Colorado corporation,<br><br>and<br><br>LIBERTY MUTUAL INSURANCE COMPANY, a<br>    Massachusetts corporation,<br><br>Defendants. | §§§§§§§§§§§§§§§§§ Case No. 1:CV-17-215 |

### DEFENDANT COBB MECHANICAL CONTRACTORS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIM SUBJECT TO ITS DEMAND FOR ARBITRATION

Defendant Cobb Mechanical Contractors, Inc. ("Cobb") files the following Answer to Plaintiff Hunt Construction Group, Inc.'s ("Hunt") Complaint, subject to Cobb's Demand for Arbitration and without waiving any ability to pursue all claims, matters, rights, remedies, and relief in arbitration.[1]  Any allegations in the Complaint not specifically denied or addressed herein are denied.

**I.
ANSWER**

1. Cobb admits that it is a subcontractor to Hunt in the construction of the new Fairmont Hotel in Austin, Texas.  Cobb admits that Hunt partially terminated Cobb's Subcontract on November 18, 2016 and made a demand under a Performance Bond issued by

---

[1]  Cobb set forth its position on the arbitrability of this dispute in Cobb's Response to Plaintiff's Motion to Stay [Doc. # 10].  This Answer and Counterclaim are being filed subject to the documents, arguments, and authorities presented in Cobb's Response.

HOU 408624817v2

Liberty Mutual to Cobb for Hunt's benefit. Cobb also admits that Liberty Mutual denied Hunt's claim. Cobb denies that the partial termination was proper and also denies that Plaintiff has any legitimate claim on the bond. Cobb denies the remaining allegations in Paragraph 1.

## THE PARTIES

2. Cobb lacks sufficient information to admit or deny the allegations in paragraph 2.

3. Cobb admits the allegations in Paragraph 3.

4. Cobb lacks sufficient information to admit or deny the allegations in paragraph 4.

## JURISDICTION AND VENUE

5. Subject to Cobb's pending arbitration demand, Cobb admits that there is subject matter jurisdiction.

6. Subject to Cobb's pending arbitration demand, Cobb admits that venue is proper in this District.

## FACTUAL BACKGROUND

**General Background**

7. Cobb admits the contentions in Paragraph 7.

8. Cobb admits the contentions in Paragraph 8.

9. Cobb admits that it signed a subcontract with Hunt for certain mechanical and plumbing works. The subcontract is the best evidence of the terms and obligations of the parties' contractual relationship. Otherwise, Cobb lacks sufficient information to admit or deny the allegations in Paragraph 9.

10. Cobb admits that it signed an agreement with Hunt in relation to certain design work. The Professional Services Agreement is the best evidence of the terms and obligations of the parties' contractual relationship. Otherwise, Cobb lacks sufficient information to admit or deny the allegations in Paragraph 10.

11. Cobb admits the contentions in Paragraph 11.

12. Cobb admits the contentions in Paragraph 12.

**Subcontract Terms Relating to Schedule,
Delay, Manpower, Damages, and Termination**

13. Cobb admits the quoted provisions are taken from the Subcontract, but otherwise deny the contentions in Paragraph 13.

14. Cobb admits that the project was supposed to be built according to a schedule. Cobb denies the remaining contentions in Paragraph 14.

15. Cobb admits that the Subcontract excerpts are accurate, but denies that the Subcontract gave Hunt control over the schedule and Cobb's work force.

16. Cobb admits that the milestone dates set out in Paragraph 16 are as originally stated in the Subcontract. However, Cobb is entitled to extensions of time to complete its work.

17. Cobb admits that under the Subcontract Hunt may require Cobb to provide a "recovery schedule" showing that Cobb will make up the lost time and how it will do so, but clarifies that this is only if it is demonstrated that Cobb is responsible for a delay.

18. Cobb admits that Hunt properly quoted portions of the Subcontract. Cobb denies the remaining contentions in Paragraph 18.

19. Cobb admits that Hunt properly quoted portions of the Subcontract. Cobb denies the remaining contentions in Paragraph 19.

**Cobb's Participation in the Scheduling Process**

20. Cobb admits that Hunt issued Project Schedules in 2015 showing a project completion date of June 3, 2017. Cobb denies the remaining contentions in Paragraph 20.

21. Cobb admits the contentions in Paragraph 21.

HOU 408624817v2

22.     Cobb clarifies that the Subcontract required both Cobb and Hunt to participate and cooperate wholly and jointly in in developing the Project Schedule.  Cobb admits that, at Hunt's request, on April 21, 2016, it provided Hunt with proposed durations and completion dates for 269 activities it was to perform on the Tower section of the Project.  Cobb denies that it did not provide a similar list of tasks, durations, and completion dates for its activities on the Podium section. Cobb denies that Hunt reflected Cobb's durations and sequencing.  Cobb otherwise denies the allegations in paragraph 22.

23.     Cobb denies the allegations in paragraph 23.

24.     Cobb denies the contentions in Paragraph 24.

**Cobb's Manpower Shortages and Delays**

25.     Cobb denies the allegations in Paragraph 25.

26.     Cobb denies the allegations in Paragraph 26.

27.     Cobb denies the allegations in Paragraph 27.

28.     Cobb denies the allegations in Paragraph 28.

29.     Cobb admits that Hunt called a meeting to discuss the progress on the Project, but denies the remaining allegations in Paragraph 29.

30.     Cobb admits that on June 27, 2016, it sent Hunt a partial schedule for its sheet metal, plumbing, and piping, showing how many crew members Cobb intended to provide for each task.  Cobb denies the remaining allegations in Paragraph 30.

**Hunt serves Cobb with a Notice of Insufficient Manpower and Delay**

31.     Cobb admits that on July 13, 2016, Hunt sent Cobb a formal Notice of Insufficient Manpower and Delay to the Project Schedule which contained the excerpts in Paragraph 31 and directed Cobb to provide a manpower-loaded recovery schedule within 48 hours.  Cobb denies

that Hunt was entitled to send such notice and otherwise denies the remaining allegations in Paragraph 31.

**Hunt serves Cobb with a first Notice of Default**

32.     Cobb admits that on July 25, 2016, Hunt served Cobb and Liberty Mutual with a Notice of Material Default under the Subcontract with the allegations enumerated in Paragraph 32.  Cobb denies that it was obligated to perform as Hunt demanded or to provide the requested recovery schedule, and otherwise denies the remainder of the allegations in paragraph 32.

33.     Cobb admits The Hunt sent a July 25 communication to Cobb. Cobb denies the remaining allegations in Paragraph 33.

**Cobb Fails to Cure Its Defaults**

34.     Cobb denies the contentions in Paragraph 34.

35.     Cobb lacks sufficient information to admit or deny what was discussed or agreed to at the September 5, 2016 meeting between Hunt and Liberty Mutual.  Cobb admits that on September 7, 2016, Hunt sent a notice to Cobb with an attached 30-day recovery schedule.

36.     Cobb admits that it responded on September 8, 2016.  Cobb also admits that it denied that the delay was Cobb's fault and that the recovery schedule was a request for acceleration. Cobb denies the remaining contentions in Paragraph 36.

37.     Cobb admits that Hunt held a meeting at the job site on September 14, 2016, but otherwise denies the allegations in Paragraph 37.

38.     Cobb denies that Hunt issued a constructible recovery schedule, and otherwise denies the allegations in Paragraph 38.

39.     Cobb admits that a meeting between Hunt and Cobb executives was held on October 25, 2016.  Cobb denies the remaining allegations in Paragraph 39.

40. Cobb admits that Hunt sent a Notice of Default. Cobb denies the remaining allegations in Paragraph 40.

41. Cobb admits that on November 2, 2016, Hunt served Cobb with another Notice of Default, which was simultaneously sent to Liberty Mutual. Cobb denies the remaining allegations in Paragraph 41.

42. Cobb denies the allegations in Paragraph 42.

43. Cobb denies the allegations in Paragraph 43.

44. Cobb is without sufficient information to admit or deny whether Hunt met with representatives of Liberty Mutual and the Fairmont Project's owner on November 17, 2016 and what was discussed at this meeting.

**Hunt Partially Terminates Cobb's Subcontract**

45. Cobb admits that on November 18, 2016, Hunt sent Cobb and Liberty Mutual a Notice of Default of Subcontract Obligations and Notice of Termination which provided three purported reasons for Hunt's partial termination of the Subcontract. Cobb denies that those reasons are true or meritorious, and otherwise denies the remaining allegations in Paragraph 45.

46. Cobb admits that Hunt's Termination Notice stated that Hunt had elected to exercise its right under the Subcontract to terminate the portion of Cobb's work that related to the Podium within three days and to continue its work on the Tower, but denies it was entitled to do so as the termination was wrongful. Cobb denies the remaining allegation in Paragraph 46.

47. Cobb is without sufficient information to admit or deny the contention in Paragraph 47.

48. Cobb admits that Hunt wrongfully retained a new subcontractor, Brandt Companies ("Brandt") to take over a portion of Cobb's contractual scope of work in the Podium. Cobb lacks sufficient information to admit or deny whether the cost to Hunt of Brandt's work

6

significantly exceeds the amount that would have been payable to Cobb, but denies that it is liable for same.  Cobb denies the remaining allegations in Paragraph 48.

**Cobb improperly files a demand for arbitration**

49. Cobb admits the contention in Paragraph 49.

50. Cobb admits that Hunt responded to Cobb's Notice of Claim.  Cobb denies the remaining contentions in Paragraph 50.

51. Cobb denies that Section 34.3 applies to this dispute.

52. Cobb admits that it filed a Demand for Arbitration Austin, Texas with the AAA on January 10, 2017, seeking "approx." $8,000,000 in damages caused by Hunt.  Cobb denies the remaining allegations in Paragraph 52. .

53. Cobb admits that Hunt sent a January 16, 2017 letter to Cobb.  Cobb denies the remaining contentions in Paragraph 53.

**Liberty Mutual denies Hunt's claim under the Performance Bond**

54. Cobb admits the contentions in Paragraph 54.

55. Cobb lacks sufficient information to admit or deny how frequently Liberty Mutual visited the site, but admits the remaining contentions in Paragraph 55.

56. Cobb admits that Liberty Mutual issued a preliminary report and that Liberty Mutual concluded that Cobb did not have any responsibility for the delays in its scope of work. Cobb lacks sufficient information to admit or deny the remaining allegation in Paragraph 56.

57. Cobb admits that it was aware that Liberty Mutual continued its investigation after January 31, 2017.

**Cobb's continuing work on the Tower**

58. Cobb admits that its ongoing contractual responsibilities have been restricted to work on the Tower and that on January 12, 2017, Hunt issued to Cobb a Notice of Default for

purported deficiencies in its work on the Tower. Cobb denies the remaining allegations in Paragraph 58.

59. Cobb admits that it and its Design Manager at Blum have issued revised Specifications for Cobb's scope of work. Cobb denies the remaining allegations in Paragraph 59.

60. Cobb admits that on February 7, 2017, Hunt issued a Required Schedule, which Cobb does not recognize as binding. Cobb denies the remaining allegations in Paragraph 60.

## COUNT I
(Breach of Contract against Cobb — Arbitration Forum)

61. Cobb denies the allegations in Paragraph 61.

62. Cobb denies the allegations in Paragraph 62.

63. Cobb denies the allegations in Paragraph 63.

64. Cobb denies the allegations in Paragraph 64.

## COUNT II
(Breach of Contract against Cobb)

65. Cobb denies the allegations in Paragraph 65.

66. Cobb denies the allegations in Paragraph 66.

67. Cobb denies the allegations in Paragraph 67.

## COUNT III
(Declaratory Judgment against Cobb)

68. Cobb denies the allegations in Paragraph 68.

69. Cobb admits the allegations in Paragraph 69.

70. Cobb denies the allegations in Paragraph 70.

71. Cobb denies the allegations in Paragraph 71.

HOU 408624817v2

## COUNT IV
(Breach of Contract against Liberty Mutual)

72. Cobb denies the allegations in Paragraph 72.

73. Cobb denies the allegations in Paragraph 73.

74. Cobb admits the allegations in Paragraph 74.

75. Cobb denies the allegations in Paragraph 75.

76. Cobb denies the allegations in Paragraph 76.

77. Cobb denies the allegations in Paragraph 77.

## **PRAYER FOR RELIEF**

78. This statement does not contain factual allegations to which a response is required by Federal Rule of Civil Procedure 8(b).  In the event that a response is required, Cobb denies that Hunt is entitled to any relief.

## II.
## **AFFIRMATIVE DEFENSES**

79. The Complaint fails to state a claim for relief against Cobb.

80. Cobb's' liability or breach of contract, if any, is excused by Hunt's prior breach of the parties' agreement.

81. Hunt's action fails because Hunt anticipatorily repudiated the contract and its contract obligations.

82. Cobb's alleged failure to perform is excused by Hunt's actions/inaction.

83. Cobb's alleged failure to perform is excused because this failure to perform was caused by conduct of other person(s) for whom Cobb is not responsible or had no right of control.

84. Hunt's action is barred by the equitable doctrines of waiver, estoppel, and/or laches.

85. Hunt has failed to mitigate its damages and has acted unreasonably in its remedial actions.

86. Hunt has failed to satisfy the conditions precedents for asserting and maintaining its claim, both as far as breach and for compensatory damages as well as its claim for attorney's fees.

87. Cobb reserves the right to amend its answer and to assert other and further affirmative or other defenses as may be warranted based upon further investigation of the Hunt's claim.

## III.
## COUNTERCLAIM

88. Cobb files this Counterclaim subject to Cobb's currently pending Demand for Arbitration. Cobb contends that the Parties must arbitrate their dispute before the American Arbitration Association. This Counterclaim is not intended as a waiver of Cobb's right to arbitration.

### Factual Background

89. The Fairmont Project consists of a seven-story "Podium" topped by a 31-story "Tower." Cobb agreed to construct and install the mechanical and plumbing systems in the Podium and Tower. To that end, the Parties entered into a July 20, 2015 Subcontract.

90. Cobb, an experienced contractor for plumbing and mechanical systems for nearly fifty years, prepared a detailed analysis of the necessary labor, materials, and supervisors required for the Fairmont Project based on the information that Hunt provided and the applicable contracts. Cobb bid the Fairmont Project, and executed the Subcontract, on the basis of its analysis. It thus reasonably expected that the actual jobsite conditions would somewhat mirror those described by Hunt.

91. Attachment II Section A.1.q of the Subcontract states that:

> (q) Subcontractor's Schedule: As described throughout the Subcontract, time is of the essence in the prosecution of Subcontractor's Work. Subcontractor will complete the work as set forth in the **mutually agreed upon CPM schedule**. Subcontractor shall perform and sequence work when and as directed by Hunt and temporarily omit any section or portion of the work as directed by Hunt and as required for coordination by other trades. Subcontractor shall complete all work within the durations set forth herein. Hunt may change Schedule dates, but this shall not relieve the Subcontractor from the obligation to perform the work within the durations set forth in this Subcontract.

[Attachment II, § A(1)(q)] (emphasis added). The requirement that the schedule be mutually agreed upon was a material condition precedent to Cobb's ability to properly perform its obligations under the Subcontract. Cobb would not have executed the Parties' Subcontract if it did not include this requirement.

92. Hunt materially breached the Subcontract by failing to communicate and cooperate with Cobb and other subcontractors regarding the schedule. Hunt never provided a workable mutually agreed upon CPM Schedule to Cobb. The schedules that Hunt provided to Cobb contained numerous scheduling errors, missing activities, and missing predecessors/successors. Moreover, the critical activity paths on the existing CPM Schedule were flawed and dysfunctional.

93. Cobb repeatedly offered to sit down with Hunt in order to fix these scheduling issues and create a mutually agreeable CPM Schedule. Given the numerous errors in Hunt's proposed CPM Schedule, Cobb believed that the Parties should meet in person to create a new CPM Schedule. Cobb repeatedly requested these meetings with Hunt. Cobb's offers fell upon deaf ears, however, as Hunt refused to engage in meaningful CPM scheduling discussions.

94. The lack of a mutually agreeable CPM schedule led to a number of Hunt Project management issues. Hunt was unable to properly manage, schedule, and sequence the

11

subcontractor work on the Project, including the predecessor work that must be completed before Cobb's work could commence. This failure led to the acceleration of Cobb's work, Cobb's performance of out of sequence work, and additional Cobb work that was beyond Cobb's original scope of work in the Subcontract.

95. Because of Hunt's improper demands and acceleration, Cobb was forced to provide workers well in excess of its initial determination. For example, Cobb's initial analysis of the Project called for a peak of 110 total workers. Because of Hunt's ineffective Project management, Cobb had over 130 workers on October 27, 2016 through November 17, 2016, peaking at over 180 total field workers at the time of termination.

96. Hunt's failure to coordinate work among subcontractors and provide adequate scheduling and sequencing/coordination of trades meant that Cobb was on its own with respect to the other subcontractors. Cobb was forced to independently coordinate its work with other subcontractors absent the guidance of a responsible general contractor. This highly inefficient process cost Cobb valuable time that it should have used to complete Cobb's scope of work. Moreover, this process was not perfect, and as a result, there was sporadic coordination between the various subcontractors.

97. The lack of a CPM Schedule, and the resulting mismanagement of the Project, was exacerbated by other Hunt site management failures. For example, Hunt failed to provide Cobb with adequate site access. Given the configuration of the Podium and Tower, Cobb had to utilize the on-site cranes and hoists/lifts in order to work. Without access to the on-site cranes and hoists/lifts, Cobb could not begin its work. Thus, it was important that Cobb have access to these resources throughout the Project.

HOU 408624817v2

98. Hunt did not provide adequate access to the on-site cranes and hoists/lifts. Cobb scheduled crane time with Hunt's on-site supervision. Hunt gave preferential treatment to other subcontractors and ignored previously scheduled reserved crane time. As happened numerous times during the Project, Cobb would give Hunt several weeks' notice of its need for the on-site crane. Hunt would affirm Cobb's request. When the time for Cobb to access the crane, however, Hunt told Cobb that there was no access. In some instances, Cobb had to pay other subcontractors to use the crane during their allotted time.

99. A similar situation occurred with respect to the buckhoists on the Project. Hunt's failure to maintain a functional buckhoist resulted in lost productivity and material handling activities. As happened numerous times during the Project, Cobb would reserve a hoist. When it was time to utilize the hoist, Hunt would not allow Cobb to utilize it because only one hoist would be operational. Hunt would then tell Cobb that it had to re-schedule.

100. Apart from Hunt's many failures to act as reasonable contractor, Hunt continuously changed the conditions for Cobb's workers. Hunt prohibited Cobb's workers from eating in the building during their breaks. This meant that Cobb's workers would have to re-locate to the ground floor, eat, and then relocate to their job site. This greatly decreased worker productivity.

101. Hunt also failed to provide workers with adequate sanitary facilities on the upper floors of the building. This forced workers to have to walk down and back up multiple levels each day just to use the restroom. Deficiencies such as these quickly added up and resulted in a significant loss of productivity for Cobb.

102. Hoping to hide its own deficient performance, Hunt terminated the Subcontract with respect to Cobb's work on the Podium. The reasons given for this termination were: (1)

HOU 408624817v2

Cobb's failure to supply sufficient labor, materials and supervisors on the Project; (2) Cobb's failure to meet the Project Schedule; and (3) Cobb's delay of other Subcontractors on the Project.

103.  None of these three rationales provide justification for Hunt's termination of Cobb's Subcontract.  As noted above, Cobb in fact utilized crew sizes that were much larger than originally expected under the information initially provided by Hunt.  Hunt's complaint about the "Project Schedule" is laughable given the fact that Hunt never provided a workable Project schedule and refused to work with Cobb on a mutually agreeable CPM Schedule.  Likewise, Hunt's claim that Cobb somehow impacted other subcontractors is absurd given Hunt's failure to provide a workable Project schedule and mismanagement of the Project.

104.  Indeed, Hunt's mismanagement continued even after its improper termination.  After termination, Cobb worked only on the Tower.  As before, Hunt has improperly accelerated Cobb's work, and this acceleration has caused Cobb to add overtime, additional shifts, additional supervision, and additional equipment rental.  Cobb expects this to continue until Project completion.

105.  Hunt's mismanagement, demands, and material unilateral changes to the Subcontract have increased Cobb's construction labor costs for overtime, additional shifts, and/or manpower.  Hunt's breaches have also caused Cobb to incur increased costs for additional equipment and maintenance.  In addition, Cobb has incurred additional costs associated with expending labor and equipment orders, increasing supervision, losing efficiency and productivity, and other increased job site and home office expenses which are directly related to Hunt's acceleration of Cobb's work.

**Claim – Breach of Contract**

106.  Cobb hereby incorporates Paragraphs 88-105 of its Counterclaim as though fully restated herein.

107.    Hunt breached the Subcontract by mismanaging the Fairmont Project then making unreasonable demands for additional labor, materials, and supervisors.  Hunt also breached the Subcontract by failing to coordinate work among subcontractors and provide adequate scheduling and sequencing/coordination of trades and failing to establish a mutually agreed upon CPM Schedule.  Hunt further breached the Subcontract by failing to providing Cobb's workers with adequate sanitary facilities, man hoists, and access to the crane and lifts, all of which has hindered Cobb's ability to apply its labor, materials, and equipment in a productive manner.

108.    Hunt further breached the Subcontract by improperly terminating Cobb's work on the Podium work.  As discussed above, Hunt's stated reasons for termination are factually unsupported and improper.

109.    Even after termination, Hunt continued to mismanage work on the Tower.  It failed to properly sequence work on the Tower.  This led to additional costs to Cobb.

110.    Hunt's mismanagement, demands, and material unilateral changes to the Subcontract caused Cobb significant damages, presently in excess of $8 million.

## Conditions Precedent

111.    Cobb has satisfied all conditions precedent for pursuing and recovering on its claim and for the recovery of its reasonable and necessary attorneys' fees.

## Prayer

WHEREFORE, Cobb prays that this Court award the following relief:

a.   An award of damages as may be proved at trial, but in no event less than $8 million;

b.   Reasonable costs and attorneys' fees; and

c.   Such other and further relief as this Court deems equitable and just.

Respectfully submitted,

**Greenberg Traurig LLP**

By : */s/ Michael L. Burnett*
       Michael L. Burnett
       Greenberg Traurig, LLC
       State Bar No. 03428700
       1000 Louisiana Street, Suite 1799
       Houston, TX 77002
       Telephone :  (713) 374-3580
       Facsimile:  (713) 374-3505
       *burnettm@gtlaw.com*

**ATTORNEYS FOR DEFENDANT COBB MECHANICAL CONTRACTORS, INC.**

## CERTIFICATE OF SERVICE

    I hereby certify that this Response was electronically filed with the Court and that counsel of record, who are deemed to have consented to electronic service in the above referenced case, are being served this 28th day of March, 2016, with a copy of the above document via the Court's CM/ECF System.

                              */s/ Michael L. Burnett*
                              Michael L. Burnett

HOU 408624817v2