IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| HUNT CONSTRUCTION GROUP, INC., an Indiana corporation, <br><br> Plaintiff, <br><br> v. <br><br> COBB MECHANICAL CONTRACTORS, INC., a Colorado corporation, <br><br> and <br><br> LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation, <br><br> Defendants. | Case No. 1:17-cv-215-LY |

**PLAINTIFF HUNT CONSTRUCTION GROUP, INC.'S ANSWER TO DEFENDANT COBB MECHANICAL CONTRACTORS, INC.'S COUNTERCLAIM**

Plaintiff Hunt Construction Group, Inc. ("Hunt") respectfully submits the following Answer to the Counterclaim filed by Defendant Cobb Mechanical Contractors, Inc. ("Cobb"). Any allegations in Cobb's Counterclaim not specifically denied or addressed herein are denied.

88. **ALLEGATIONS:** Cobb files this Counterclaim subject to Cobb's currently pending Demand for Arbitration. Cobb contends that the Parties must arbitrate their dispute before the American Arbitration Association. This Counterclaim is not intended as a waiver of Cobb's right to arbitration.

**ANSWER:** To the extent any answer to this paragraph 88 is required, Hunt denies that the Parties must arbitrate their dispute before the American Arbitration Association.

**Factual Background**

89. **ALLEGATIONS:** The Fairmont Project consists of a seven-story "Podium" topped by a 31-story "Tower." Cobb agreed to construct and install the mechanical and plumbing systems in the Podium and Tower. To that end, the Parties entered into a July 20, 2015 Subcontract.

1

**ANSWER:** Hunt denies that this paragraph accurately describes the scope of Cobb's obligations on the Project or its agreements in the Subcontract. Hunt admits that the Project consists of a seven-story Podium topped by a 31-story Tower. Hunt admits that Hunt and Cobb entered into a Subcontract on July 20, 2015 and refers to the Subcontract for its full meaning and scope. Hunt denies the remaining allegations in Paragraph 89.

90. **ALLEGATIONS:** Cobb, an experienced contractor for plumbing and mechanical systems for nearly fifty years, prepared a detailed analysis of the necessary labor, materials, and supervisors required for the Fairmont Project based on the information that Hunt provided and the applicable contracts. Cobb bid the Fairmont Project, and executed the Subcontract, on the basis of its analysis. It thus reasonably expected that the actual jobsite conditions would somewhat mirror those described by Hunt.

**ANSWER:** Hunt lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 and therefore denies them.

91. **ALLEGATIONS:** Attachment II Section A.1.q of the Subcontract states that:

> (q) Subcontractor's Schedule: As described throughout the Subcontract, time is of the essence in the prosecution of Subcontractor's Work. Subcontractor will complete the work as set forth in the mutually agreed upon CPM schedule. Subcontractor shall perform and sequence work when and as directed by Hunt and temporarily omit any section or portion of the work as directed by Hunt and as required for coordination by other trades. Subcontractor shall complete all work within the durations set forth herein. Hunt may change Schedule dates, but this shall not relieve the Subcontractor from the obligation to perform the work within the durations set forth in this Subcontract.

[Attachment II, § A(1)(q)] (emphasis added). The requirement that the schedule be mutually agreed upon was a material condition precedent to Cobb's ability to properly perform its obligations under the Subcontract. Cobb would not have executed the Parties' Subcontract if it did not include this requirement.

**ANSWER:** Hunt admits that Paragraph 91 accurately quotes the text of Attachment II Section A.1.q of the Subcontract, except that it has misquoted the title of the Section as "Subcontractor's Schedule" rather than the correct title, "Subcontractor Schedule." Hunt denies the allegation that the requirement that the schedule be mutually agreed upon "was a material condition precedent to Cobb's ability to properly perform its obligations under the Subcontract." Hunt lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 91 and therefore denies them.

92. **ALLEGATIONS:** Hunt materially breached the Subcontract by failing to communicate with Cobb and other subcontractors regarding the schedule. Hunt never provided a workable mutually agreed upon CPM Schedule to Cobb. The schedules that Hunt provided to Cobb contained numerous scheduling errors, missing activities, and missing predecessors/successors. Moreover, the critical activity paths on the existing CPM Schedule were flawed and dysfunctional.

**ANSWER:** Denied.

93. **ALLEGATIONS:** Cobb repeatedly offered to sit down with Hunt in order to fix these schedule issues and create a mutually agreed CPM Schedule. Given the numerous efforts in Hunt's proposed CPM Schedule, Cobb believed that the Parties should meet in person to create a new CPM Schedule. Cobb repeatedly requested these meetings with Hunt. Cobb's offers fell upon deaf ears, however, as Hunt refused to engage in meaningful CPM scheduling discussions.

**ANSWER:** Hunt lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 93 as to Cobb's belief and therefore denies them. Hunt denies the remaining allegations in Paragraph 93.

94. **ALLEGATIONS:** The lack of a mutually agreed CPM schedule led to a number of Hunt Project management issues. Hunt was unable to properly manage, schedule, and sequence the subcontractor work on the Project, including the predecessor work that must be completed before Cobb's work could commence. This failure led to the acceleration of Cobb's work, Cobb's performance of out of sequence work, and additional Cobb work that was beyond Cobb's original scope of work in the Subcontract.

**ANSWER:** Denied.

95. **ALLEGATIONS:** Because of Hunt's improper demands and acceleration, Cobb was forced to provide workers well in excess of its initial determination. For example, Cobb's initial analysis of the Project called for a peak of 110 total workers. Because of Hunt's ineffective Project management, Cobb had over 130 workers on October 27, 2016 through November 17, 2016, peaking at over 180 total field workers at the time of termination.

**ANSWER:** Denied.

96. **ALLEGATIONS:** Hunt's failure to coordinate work among subcontracts and provide adequate scheduling and sequencing/coordination of trades meant that Cobb was on its own respect to the other subcontractors. Cobb was forced to independently coordinate its work with other subcontractors absent the guidance of a responsible general contractor. This highly

inefficient process cost Cobb valuable time that it should have used to complete Cobb's scope of work. Moreover, this process was not perfect, and as a result, there was sporadic coordination between the various subcontractors.

**ANSWER:** Denied.

97. **ALLEGATIONS:** The lack of a CPM Schedule, and the resulting mismanagement of the project, was exacerbated by other Hunt site management failures. For example, Hunt failed to provide Cobb with adequate site access. Given the configuration of the Podium and Tower, Cobb had to utilize the on-site cranes and hoists/lifts in order to work. Without access to the on-site cranes and hoists/lifts, Cobb could not begin its work. Thus, it was important that Cobb have access to these resources throughout the Project.

**ANSWER:** Hunt admits that Cobb's work involved use of the Project's on-site cranes and hoists/lifts from time to time in conjunction with their use by Hunt and other subcontractors and consistent with the limitations agreed in the Subcontract. Hunt denies the remaining allegations in Paragraph 97.

98. **ALLEGATIONS:** Hunt did not provide adequate access to the on-site cranes and hoists/lifts. Cobb scheduled crane time with Hunt's on-site supervision. Hunt gave preferential treatment to other subcontractors and ignored previously scheduled reserved crane time. As happened numerous times during the Project, Cobb would give Hunt several weeks' notice of its need for the on-site crane time. Hunt would affirm Cobb's request. When the time for Cobb to access the crane, however, Hunt told Cobb that there was no access. In some instances, Cobb had to pay other subcontractors to use the crane during their allotted time.

**ANSWER:** Hunt lacks knowledge or information sufficient to form a belief about the truth of the allegation that "[i]n some instances, Cobb had to pay other subcontractors to use the crane during their allotted time" and therefore denies it. Hunt admits that Cobb was required to schedule crane time with Hunt's on-site supervision, subject to the terms of the Subcontract. Hunt denies the remaining allegations of Paragraph 98.

99. **ALLEGATIONS:** A similar situation occurred with respect to the buckhoists on the Project. Hunt's failure to maintain a functional buckhoist resulted in lost productivity and material handling activities. As happened numerous times during the Project, Cobb would reserve a hoist. When it was time to utilize the hoist, Hunt would not allow Cobb to utilize it because only one hoist would be operational. Hunt would then tell Cobb that it had to re-schedule.

**ANSWER:** Denied.

4849-1332-1543.v1

100.    **ALLEGATIONS:**    Apart from Hunt's many failures to act as reasonable contractor, Hunt continuously changed the conditions for Cobb's workers. Hunt prohibited Cobb's workers from eating in the building during their breaks. This meant that Cobb's workers would have to relocate to the ground floor, eat, and then relocate to their job site. This greatly decreased worker productivity.

**ANSWER:**    Hunt admits that it prohibited *all* subcontractor personnel from eating in the building during breaks after they failed to clean up their trash and refuse, creating dangerous and unsanitary conditions and unsightly messes. Hunt denies the remaining allegations of Paragraph 100.

101.    **ALLEGATIONS:**    Hunt also failed to provide workers with adequate sanitary facilities on the upper floors of the building. This forced workers to have to walk down and back up multiple levels each day just to use the restroom. Deficiencies such as these quickly added up and resulted in a significant loss of productivity for Cobb.

**ANSWER:**    Denied.

102.    **ALLEGATIONS:**    Hoping to hide its own deficient performance, Hunt terminated the Subcontract with respect to Cobb's work on the Podium. The reasons given for this termination were: (1) Cobb's failure to supply sufficient labor, materials and supervisors on the Project; (2) Cobb's failure to meet the Project Schedule; and (3) Cobb's delay of other Subcontractors on the Project.

**ANSWER:**    Hunt admits that it terminated the Subcontract with respect to Cobb's work on the Podium, and that Hunt's Notice of Default of Subcontract Obligations and Notice of Termination included the three reasons stated, except that the precise wording of the first reason listed was "Failure to supply sufficient labor, materials and supervision," rather than "Cobb's failure to supply sufficient labor, materials, and supervisors on the Project." Hunt denies the remaining allegations in Paragraph 102.

103.    **ALLEGATIONS:**    None of these three rationales provide justification for Hunt's termination of Cobb's Subcontract. As noted above, Cobb in fact utilized crew sizes that were much larger than originally expected under the information initially provided by Hunt. Hunt's complaint about the "Project Schedule" is laughable given the fact that Hunt never provided a workable Project schedule and refused to work with Cobb on a mutually agreed CPM Schedule. Likewise, Hunt's claim that Cobb somehow impacted other subcontractors is absurd given Hunt's failure to provide a workable Project schedule and mismanagement of the Project.

**ANSWER:**   Denied.

104.   **ALLEGATIONS:**   Indeed, Hunt's mismanagement continued even after its improper termination.  After termination, Cobb worked only on the Tower.  As before, Hunt has improperly accelerated Cobb's work, and this acceleration has caused Cobb to add overtime, additional shifts, additional supervision, and additional equipment rental.  Cobb expects this to continue until Project completion.

**ANSWER:**   Hunt admits that, after termination, Cobb worked only on the Tower.  Hunt lacks knowledge or information sufficient to form a belief about the truth of the allegation as to what Cobb "expects" and therefore denies it.  Hunt denies the remaining allegations in Paragraph 104.

105.   **ALLEGATIONS:**   Hunt's mismanagement, demands, and material unilateral changes to the Subcontract have increased Cobb's construction labor costs for overtime, additional shifts, and/or manpower.  Hunt's breaches have also caused Cobb to incur increased costs for additional equipment and maintenance.  In addition, Cobb has incurred additional costs associated with expending labor and equipment orders, increasing supervision, losing efficiency and productivity and other increased job site and home office expenses which are directly related to Hunt's acceleration of Cobb's work.

**ANSWER:**   Denied.

### Claim – Breach of Contract

106.   **ALLEGATIONS:**   Cobb hereby incorporates Paragraphs 88-105 of its Counterclaim as though fully restated herein.

**ANSWER:**   Hunt hereby incorporates its answers to Paragraphs 88-105 of Cobb's Counterclaim as though fully restated herein.

107.   **ALLEGATIONS:**   Hunt breached the Subcontract by mismanaging the Fairmont Project then making unreasonable demands for additional labor, materials, and supervisors.  Hunt also breached the Subcontract by failing to coordinate work among subcontractors and provide adequate scheduling and sequencing/coordination of trades and failing to establish a mutually agreed upon CPM Schedule.  Hunt further breached the Subcontract by failing to providing Cobb's workers with adequate sanitary facilities, man hoists, and access to the crane and lifts, all of which has hindered Cobb's ability to apply its labor, materials, and equipment in a productive manner.

**ANSWER:**   Denied.

108.   **ALLEGATIONS:**   Hunt further breached the Subcontract by improperly terminating Cobb's work on the Podium work.  As discussed above, Hunt's stated reasons for termination are factually unsupported and improper.

6

**ANSWER:**   Denied.

109.   **ALLEGATIONS:**   Even after termination, Hunt continued to mismanage work on the Tower.  It failed to properly sequence work on the Tower.  This led to additional costs to Cobb.

**ANSWER:**   Denied.

110.   **ALLEGATIONS:**   Hunt's mismanagement, demands, and material unilateral changes to the Subcontract caused Cobb significant damages, presently in excess of $8 million.

**ANSWER:**   Denied.

## Conditions Precedent

111.   **ALLEGATIONS:**   Cobb has satisfied all conditions precedent for pursuing and recovering on its claim and for the recovery of its reasonable and necessary attorneys' fees.

**ANSWER:**   Denied.

## AFFIRMATIVE DEFENSES

1. Hunt's liability for breach of the Subcontract, if any, is excused by Cobb's prior breaches of the Subcontract.

2. Hunt's liability for breach of the Subcontract, if any, is excused by Cobb's prior breaches of the parties' Professional Services Agreement.

3. Cobb's claims fail because it anticipatorily repudiated its obligations under the Subcontract.

4. Cobb is estopped from denying there was no valid schedule to which it was bound.

5. Cobb's claims fail because it failed to provide Hunt with proper and timely notice pursuant to the Subcontract's terms.

6. Cobb's claims fail under the doctrines of unclean hands and *in pari delicto*.

4849-1332-1543.v1

7. If, and to the extent that, Cobb is awarded any damages for any of its claims, the amounts are offset by damages incurred by Hunt as a result of Cobb's breaches and by overpayments by Hunt to Cobb under Cobb's payment applications.

## ADDITIONAL DEFENSE

8. Cobb's claim for breach of contract fails to state a claim upon which relief can be granted.

## PRAYER FOR RELIEF

WHEREFORE, Hunt requests that Cobb's Counterclaim be dismissed in its entirety, that Cobb take nothing thereunder, that the Court award Hunt its reasonable attorneys' fees and costs pursuant to the Subcontract and applicable Texas law, and that the Court award such other and further relief as the Court deems equitable and just.

Dated: April 18, 2017               Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Casey Low*
    Casey Low
    401 Congress Avenue
    Suite 1700
    Austin, Texas 78701
    (512) 580-9616
    Casey.Low@pillsburylaw.com

    Steven G.M. Stein (*admitted pro hac vice*)
    C. Steven Tomashefsky (*admitted pro hac vice*)
    STEIN RAY LLP
    222 West Adams St.
    Suite 1800
    Chicago, Illinois 60606
    (312) 641-3700
    sstein@steinraylaw.com
    stomashefsky@steinraylaw.com

**ATTORNEYS FOR PLAINTIFF
HUNT CONSTRUCTION GROUP, INC.**

4849-1332-1543.v1

## CERTIFICATE OF SERVICE

  I hereby certify that on April 18, 2017, I electronically submitted a true and correct copy of the above with the clerk of court for the U.S. District Court, Western District of Texas. I hereby certify that I have served all parties of record below in a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

             /s/ Casey Low
             Casey Low


Michael L. Burnett
GREENBURG TRAURIG, LLC
1000 Louisiana Street, Suite 1799
Houston, TX 77002
burnetm@gtlaw.com

ATTORNEY FOR DEFENDANT
COBB MECHANICAL CONTRACTORS, INC.


Keith A. Langley
LANGLEY, LLP
1301 Solana Blvd., Bldg. 1, Suite 1545
Westlake, TX 76262
klangley@l-llp.com

ATTORNEY FOR LIBERTY MUTUAL
INSURANCE COMPANY