# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC.,<br>    an Indiana corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:17-CV-00215 |
| v. | ) ) | |
| COBB MECHANICAL CONTRACTORS, INC.,<br>    a Colorado corporation, | ) ) ) | |
| and | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY,<br>    a Massachusetts corporation, | ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Hunt Construction Group, Inc. ("Hunt") complains against Defendant Cobb Mechanical Contractors, Inc. ("Cobb") and Liberty Mutual Insurance Company ("Liberty Mutual") as follows:

1.     This case involves Cobb's fraudulent inducement and breaches of contract and fiduciary duty in performing its obligations as a subcontractor to Hunt in the construction of the new Fairmont Hotel in Austin, Texas (the "Fairmont Project").  Hunt's goal, as general contractor, is and has been to deliver the Fairmont Project on time and on budget.  For its part, Cobb has wrongfully denied any obligation to perform within the project schedule and has failed to do so.  Nor has Cobb complied with its obligation to recover schedule delays by providing additional skilled labor.   On November 18, 2016, based on Cobb's deficient and defective performance, Hunt partially terminated Cobb's Subcontract and was required to retain a

replacement subcontractor, incurring significant additional costs.  In addition, though Hunt has made a demand under a Performance Bond issued by Liberty Mutual to Cobb for Hunt's benefit, Liberty Mutual has wrongfully denied Hunt's claim and has refused to acknowledge any obligation under the bond.

## THE PARTIES

2.      Hunt is incorporated under the laws of the State of Indiana and has its principal place of business in Indianapolis, Indiana.  Hunt has been in business as a general contractor since 1944 and has been responsible for the construction of numerous large projects throughout the country.  Recent examples include the Federal Office Building in San Francisco; the Collin County, Texas Justice Center; the International Terminal at the Atlanta Airport; the Phoenix Convention Center; the San Antonio Military Medical Center; the Procter & Gamble corporate headquarters in Cincinnati; and the J.W. Marriott Hotel in Austin.

3.      Cobb is incorporated under the laws of the State of Colorado and has its principal place of business in Colorado Springs, Colorado.  Cobb is a mechanical and plumbing contractor, meaning its field is primarily the design and installation of heating-ventilating-air conditioning ("HVAC"), plumbing, and piping systems.

4.      Liberty Mutual is incorporated under the laws of the State of Massachusetts and has its principal place of business in Boston, Massachusetts.  Liberty Mutual is registered to do business in Texas and regularly does business in Texas.

**JURISDICTION AND VENUE**

5.      This court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1332(a) and (c) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.      Venue is proper in this District because the dispute arose in this District and because Hunt and Cobb, in their Subcontract, stipulated that the venue of any court action to resolve disputes under the contract "shall be in the jurisdiction in which the Project is located," which is this District.   Liberty Mutual's Performance Bond incorporates the Subcontract's terms by reference.

**FACTUAL BACKGROUND**

**General Background**

7.      The Fairmont Project is located at the corner of East Cesar Chavez and Red River Streets in downtown Austin.   When completed, it will consist of a four-level underground parking garage and a seven-story "podium" topped by a 31-story tower.   The podium will include ballrooms, meeting rooms, restaurant space, and other amenities, while the tower will consist primarily of guest rooms.

8.      On May 19, 2014, Hunt signed a contact with the Owner to construct the Fairmont Project for a guaranteed maximum price, with substantial completion to be achieved by June 3, 2017.

9.      As is typical, Hunt then retained a variety of subcontractors to perform specific scopes of work on the Fairmont Project.   Although the Owner had retained architects and engineers to design the hotel, the plumbing, HVAC, piping, and related work (the "mechanical and plumbing" scope) was to be performed on a "design-build" basis in which Hunt, or a Hunt

subcontractor, would design the mechanical and plumbing systems and then construct and install them.

10.     On October 3, 2014, Hunt signed a Professional Services Agreement with Cobb pursuant to which Cobb was to design the mechanical and plumbing systems. Cobb retained Blum Consulting Engineers, Inc. ("Blum") to perform engineering work and stamp engineering drawings as the engineer of record under applicable law. To facilitate that process, Cobb designated a member of Blum's staff as Design Manager for Cobb's design-build scope of work.

11.     On July 20, 2015, Hunt entered into a Subcontract with Cobb (the "Subcontract"), pursuant to which Cobb was to construct and install the mechanical and plumbing systems at the Fairmont Project for the lump sum of $30,938,190.00.

12.     Pursuant to the Subcontract's terms, Cobb was to obtain bond coverage to ensure the Project's completion. On August 26, 2015, Liberty Mutual issued its Subcontract Performance Bond No. 906001924 to Cobb for Hunt's benefit in the amount of $30,938,190.00 (the "Performance Bond"). The purpose of the Performance Bond is to guaranty Cobb's performance of its obligations under the Subcontract and to compensate Hunt for its costs and expenses should Cobb fail to meet its obligations. The Performance Bond identifies the Subcontract and states that the Subcontract "is by reference made a part hereof."

**Subcontract Terms Relating to Schedule,
Delay,  Manpower, Damages, and Termination**

13.     In the Subcontract, Cobb made several significant representations to Hunt regarding its capacity to perform the Subcontract, including:

> (a) Subcontractor represents that it has . . . investigated and satisfied itself with respect to . . . the availability and adequacy of personnel and workers and the prevailing wage scales . . . . [§ 3.5]

4

(b) Subcontractor hereby represents and warrants that Subcontractor is experienced in performing the type, quality and quantity of work required for performance of this Subcontract, . . . and has sufficient management, supervision and labor capacity to properly perform this Subcontract.  [§ 3.9]

(c) It is understood that this is a fast-track oriented project with all the ramifications and considerations of such a project.  The Subcontractor agrees that the total Scope of Work is understood and that consideration has been made for the intent of the total work involved, which is accounted for in the Subcontract Price.  [Attachment II, § r]

14.     As in most such projects, the Fairmont Project was to be built according to a schedule setting forth a plan for completing the Fairmont Project within the time required by the Owner. The project's schedule included the sequencing and duration of tasks to be performed by all subcontractors (sometimes referred to as "trades") on the job, as well as milestone dates by which certain tasks were to be initiated or completed.  In a construction schedule of this type, sequencing and duration of specific tasks are important because the work by all subcontractors generally must be performed in a logical order, and frequently certain tasks cannot be started until certain others are completed.  Thus, if the earlier task is delayed or exceeds its allotted duration, the later tasks by the same or other subcontractors would be delayed as well.  In such cases, the tasks might need to be resequenced, or a subcontractor might be required to shorten the durations of certain tasks, to achieve on-time completion of the project as a whole.

15.     Thus, the Subcontract gave Hunt control over the schedule and Cobb's work force to provide flexibility in achieving on-time overall completion.   For example, it provides:

(a) Time is of the essence in this Subcontract.  Subcontractor recognizes that Hunt and/or the Owner may sustain severe financial loss if the Project or any part of it is delayed because Subcontractor fails to perform any or all of the Subcontract Work in accordance with this Subcontract, the Contract Documents or the Project Schedule (as hereinafter defined).   Hunt shall have the right throughout the term of this Subcontract to request such assurances as are reasonably necessary to ensure that the Subcontract Work can be and is being competed in accordance with the Project Schedule and the other requirements of this Subcontract. [§ 9.1]

(b) Subcontractor shall commence the Subcontract Work when directed by Hunt to do so and, subject to the condition as set forth in Section 9.4, shall diligently and continuously prosecute, perform and complete the Subcontract Work so that neither Hunt nor any other person or entity will be delayed by any act or omission of Subcontractor in completing the Subcontract Work on the Project in accordance with this Subcontract, the Contract Documents, the Project Schedule (as hereinafter defined) and any revisions thereto.  [§ 9.2]

(c) The Subcontractor shall participate and cooperate in the development of Hunt's project schedule (the "Project Schedule") by providing information for the scheduling of the times and sequences of operations required for the Subcontract Work to meet Hunt's overall schedule requirements.  Subcontractor shall continuously monitor Hunt's Project Schedule so as to be fully familiar with the timing, phasing and sequence of operations of the Subcontract Work in accordance with the requirements of the Project Schedule, including any revisions thereto and shall meet all interim or final milestone dates included in the Project Schedule.  A copy of the then current Project Schedule will be maintained at the Project Site for Subcontractor's review, so that Subcontractor may comply with its obligation above to continuously monitor the Project Schedule.  Subcontractor shall submit within five (5) days after execution of this Subcontract, in a form prescribed by Hunt, for Hunt's approval, Subcontractor's detailed plan and schedule for performing and coordinating the Subcontract Work in conformance with the Project Schedule and other work on the Project.  [§ 9.3]

(d) Hunt shall have the right at any and all times to modify the Project Schedule, to suspend, delay, or accelerate, in whole or in art, the commencement or execution of the Subcontract Work or any portion thereof or to vary the sequence thereof, to reasonably decide the time, order and priority of the various portions of the Subcontract Work, and all other matters relating to the scheduling and coordination of the Subcontract Work with other work on the Project.  As the Project progresses, Hunt also shall have the right to modify the time, order and priority of the various portions of the Subcontract Work, and all other matters relating to the scheduling and coordination of the Subcontract Work, in order to respond to job conditions and/or achieve timely completion of the entire Project.  Subcontractor shall not be entitled to any additional compensation for decisions or changes made by Hunt pursuant to this Section 9.4 except as provided in Section 9.7.  [§ 9.4]

(e) If ordered by Hunt in writing, Subcontractor shall work overtime and/or add additional manpower or shifts:

    (a)    If Subcontractor is not behind schedule, Hunt will pay Subcontractor the actual additional premium portion of wages for overtime or additional shift work not then included in the Subcontract Sum, plus any taxes on such additional wages, but no overhead or profit;

    (b)    If Subcontractor, through its sole or partial fault or neglect, is behind schedule, Hunt may order Subcontractor to increase its manpower or to

work, at Subcontractor's expense, any overtime or additional shifts or take any other action necessary to expedite the Subcontract Work to meet the Project Schedule.  [§ 9.7]

(f) Time is of the essence in this Subcontract.  Subcontractor recognizes that Hunt and Owner may sustain financial loss of the Project or any art of it is delayed because the Subcontractor or it's [*sic*] sub-Subcontractor or suppliers fails to perform any or all of its Work in accordance with this Subcontract, the Subcontractor shall appropriate sufficient manpower, scheduling resources, equipment resources, overtime work, shift work, weekend work, expediting of all materials and equipment as is required to meet the Schedule as defined in the Subcontract Documents, or the Schedule as defined in this Subcontract.  Subcontractor shall pay overtime labor and equipment costs or add additional manpower or shifts to meet the Schedule at no additional cost to Hunt or Owner due to his own non-conformance with the Schedule, Subcontract, or Subcontract Documents unless the non-conformance is due to interference, delays or schedule changes caused by other Subcontractor.  [Attachment II, § A(1)(p)]

(g) Subcontractor's Schedule:  As described throughout the Subcontract, time is of the essence in the prosecution of Subcontractor's Work.  Subcontractor will complete the work as set forth in the mutually agreed upon CPM schedule.  Subcontractor shall perform and sequence work when and as directed by Hunt and temporarily omit any section or portion of the work as directed by Hunt and as required for coordination by other trades.  Subcontractor shall complete all work within the durations set forth herein.  Hunt may change Schedule dates, but this shall not relieve the Subcontractor from the obligation to perform the work within the durations set forth in this Subcontract.  [Attachment II, § A(1)(q)]

(g) Subcontractor is advised that the implied milestones and sequencing outlined herein is generic in nature and demonstrates the construction activities in a general manner only.  Subcontractor will be required to wholly and jointly participate in developing a detailed schedule for Hunt to approve and monitor, with which all trades may successfully and expeditiously perform the work within the framework schedule delineated herein.  Subcontractor shall provide project schedule information and updates of actual progress vs. original schedule as required by Hunt.  [Attachment II, § A(1)(s)]

16.   The milestone dates provided in the Subcontract are:

Temporary Ejector Pumps Operational:                                          9-15-16

Domestic Hot Water System Operational:                                       10-10-16

Chilled Water System Operational:                                                  1-5-17

Commissioning & BMS [building management] System Complete:       4-1-17

> T&B [test and balance] Complete & Reports Submitted          5-1-17
>
> Substantial Completion:                                       6-3-17

[Attachment II, §§ B(2)(c); B(3)(b)]

17.     The Subcontract further provides a mechanism for getting the schedule back on track if Cobb is delayed:  Hunt may require Cobb to provide a "recovery schedule" showing that Cobb will make up the lost time and how it will do so:

> In addition to the requirements of Article 9.7 of the Subcontract Agreement, if it is demonstrated that Subcontractor is responsible in a delay, Hunt may require Subcontractor to submit a recovery schedule demonstrating is program and proposed plan to make up the lag in scheduled progress and to ensure completion of the Work by the date sixed in the Subcontract. [Attachment II, § A(1)(x)]

18.     Further, the Subcontract provides that Cobb is liable to Hunt for all damages caused by its delays:

> Subcontractor shall be liable to Hunt for all damages, including any liquidated damages payable to the Owner for delays caused in whole or in part by Subcontractor or Subcontractor's employees, agents, sub-subcontractors, material suppliers or any other person or entity for whose acts Subcontractor may be liable.  In addition to such damages assessed against Hunt by Owner, Subcontractor also shall be liable for all other actual damages to Hunt caused or contributed to by delays caused in whole or in part by Subcontractor or Subcontractor's employees, agents, sub-subcontractors, material suppliers or any other person or entity for whose acts Subcontractor may be liable. . . .  [§ 32.1]

19.     Finally, the Subcontract provides that Hunt is not required to sit by and wait while delays and damages mount up.  Rather, Hunt has the right to terminate the Subcontract, in whole or in part, for cause:

> If at any time Subcontractor:
>
> (a) fails or refuses to supply sufficient labor, materials, tools, equipment or supervision;
>
> (b) fails or refuses to perform the Subcontract Work promptly and diligently;
>
> (c) fails to meet the Project Schedule;

(d) causes delay, interference or stops the work of Hunt or any other contractors or subcontractors;

(e) fails or refuses to perform any of its obligations under this Subcontract;

* * *

then in any of such events, each of which shall constitute a material default under this Subcontract, Hunt shall have the right, in addition to any other rights and remedies provided under this Subcontract or by law, after three (3) day's written notice to Subcontractor:

(1)     to order Subcontractor to add manpower or to work overtime or additional shifts at no additional cost to Hunt or Owner; and/or

(2)     to delay payment of all or part of the Subcontract Sum until Subcontractor conforms to the Project Schedule; and/or

(3)     to take over and perform through Hunt, or through others selected by Hunt, the Subcontract Work until, in Hunt's sole judgment, Subcontractor's default has been cured, and deduct from the Subcontract Sum the cost thereof plus an overhead fee of ten percent (10%) and a profit of ten percent (10%); and/or

* * *

(5)     to terminate all or any portion of Subcontractors right to proceed under the Subcontract and to enter upon the premises and take possession, for the purpose of completing that portion of the Subcontract Work affected by such termination, of all Subcontractor's records, drawings, documents, materials, tools and equipment and all other items relating to that subject portion of the Subcontract Work, including materials stored off-site for use in completing the Subcontract Work.  In case of such termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Subcontract with respect to such portion of the Subcontract Work until that portion of the Subcontract Work shall be wholly completed to the satisfaction of Hunt, the Owner and Designer, and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Subcontract shall exceed the cost and expense incurred by Hunt in completing said portion of the Subcontract Work, such excess shall be paid by Hunt to the Subcontractor as set forth below; but if such cost and expanse shall exceed such unpaid balance, then the Subcontractor shall pay the difference to Hunt as set forth below. . . .
[§ 30.1]

**Cobb's Participation in the Scheduling Process**

20.     Hunt had issued Project Schedules in 2015 showing a project completion date of June 3, 2017.  But a heavy rain event and an unanticipated issue with the foundation footings caused delays that were no one's fault, which justified extending the completion date.  During the first few months of 2016, Hunt worked with its subcontractors to develop a new Project Schedule, including durations and sequences of the Fairmont Project's tasks to complete the Project within the extended time required by Hunt's contract with the Owner.

21.     Cobb began its work under the Subcontract in the spring of 2015 before the new Project Schedule was completed.

22.     As noted above, § 9.3 and Attachment II § A(1)(s) of the Subcontract required Cobb to "participate and cooperate," "wholly and jointly," in developing the Project Schedule.  Hunt therefore requested from Cobb a set of its proposed activities, durations, and sequences for the mechanical and plumbing work.  On April 21, 2016, Cobb provided to Hunt a spreadsheet with proposed durations and completion dates for 269 individual activities it was to perform on the Tower section of the Fairmont Project (levels 8-37).  Cobb provided no similar list of tasks, durations, and completion dates for its activities on the Podium section of its scope of work.

23.     Hunt incorporated the overwhelming majority of Cobb's proposals into the Project Schedule.  Only two of the 269 activities were not incorporated as Cobb had proposed: one that was a duplicate activity and one that was shortened from 15 days to 10 days.  As noted, Cobb provided no list of activities, durations, and sequences for the Podium section of the work for Hunt to incorporate.  Hunt therefore incorporated activities, durations, and sequences from the prior Project Schedule.

24.     On June 9, 2016, Hunt issued an overall Project Schedule known as the "Re-Baseline" schedule, with a new project completion date of August 9, 2017.  When the Re-Baseline Project Schedule was issued, Cobb did not object to the durations, start and finish dates, or the activity sequencing that was established for its work in the Tower and the Podium.

**Cobb's Manpower Shortages and Delays**

25.     By late June 2016, it had become apparent to Hunt that Cobb was already falling behind.  For example, Cobb was not providing sufficient qualified manpower to complete its earliest tasks, which were to install plumbing, sheet metal, mechanical piping, and HVAC risers from the Podium up through the Tower and to set and connect fan coil units ("FCUs") on each floor.  Cobb was also failing to deliver required materials and equipment to the Project site in adequate quantities to install in areas that had become available for Cobb to be working, causing further delay.

26.     Further, Cobb was not meeting the dates for completion of rough-in work on the first- and third-floor bathrooms, nor was work progressing on the Central Plant.

27.     Thus, by late June 2016, the Fairmont Project was at a near standstill, and the Project Schedule was falling behind each day that Cobb fell behind.

28.     Cobb was responsible for obtaining inspections and approvals of its work from the City of Austin before additional work could be completed.  Those inspections were not taking place in a timely manner, in part because Cobb had not finished its work to be ready for inspection.  Further, when inspections did take place, Cobb failed several of them, requiring rework of the existing installations.

29.     Hunt was alarmed that Cobb was falling behind so quickly.  Hunt called a meeting with Cobb at the job site to express its concern.  At that time, Cobb promised it would get back on track.

30.     On June 27, 2016, Cobb sent Hunt a partial make-up schedule for its sheet metal, plumbing, and piping, showing how many crew members Cobb intended to provide for each task.   That schedule did not meet milestone dates in the Project Schedule or provide sufficient manpower to recover the lost days.

**Hunt serves Cobb with a Notice of Insufficient Manpower and Delay**

31.     Cobb failed to take steps to recover the schedule after sending its June 27, 2016 partial make-up schedule.  On July 13, 2016, Hunt sent Cobb a formal Notice of Insufficient Manpower and Delay to the Project Schedule.  In that Notice, Hunt noted that:

- Cobb was not providing sufficient manpower to meet the Project Schedule;

- Cobb's June 27, 2016 partial make-up schedule did not meet the required milestone dates, particularly because the tower risers would not complete until 2017, requiring other subcontractors to accelerate their work if the Fairmont Project was to be completed on time and possibly jeopardizing on-time completion;

- Sheet metal, plumbing, and piping work were behind schedule throughout floors 1-7;

- Cobb had yet to complete any area and have it inspected, putting all other work on the Podium on hold.

Hunt's Notice directed Cobb to provide a manpower-loaded recovery schedule within 48 hours, showing how Cobb intended to complete its work on the Tower and the Podium on time without slowing down other subcontractors' work.

**Hunt serves Cobb with a first Notice of Default**

32.    Cobb did not cure the deficiencies identified in Hunt's July 13 Notice and failed to provide the complete recovery schedule the July 13 Notice required.   Therefore, on July 25, 2016, Hunt served Cobb and Liberty Mutual with a Notice of Material Default under the Subcontract.  The July 25 Notice stated, among other things, that Cobb:

> (a) failed or refused to supply sufficient labor, materials, tools, equipment or supervision;
>
> (b) failed or refused to perform Subcontract work promptly and diligently;
>
> (c) failed to meet the Project Schedule; and
>
> (d) caused delay, interference or stopped work of other subcontractors.

In light of those defaults, Hunt required Cobb to provide within three days a detailed manpower-loaded recovery schedule that reflected completion and inspection of Cobb's work consistent with the activity durations and sequences Cobb provided on April 21, 2016 and the Re-Baseline Schedule, which incorporated them.

33.    Finally, Hunt's July 25 Notice stated that, if Cobb failed to provide the required recovery schedule, Hut would exercise its remedies under the Subcontract, which included, among other things, taking over and performing through Hunt or others selected by Hunt the Subcontract Work until in Hunt's sole judgment the default has been cured, deducting from the Subcontract Sum the cost thereof plus overhead and fee.

**Cobb Fails to Cure Its Defaults**

34.    Cobb did not cure the defaults identified in Hunt's July 25 Notice and failed to provide a recovery schedule.

35.     On September 5, 2016, Hunt met with representatives of Liberty Mutual to discuss the Fairmont Project's status.  In that meeting, it was agreed that Hunt would provide a 30-day recovery schedule to Cobb, identifying the activities and dates that Cobb must meet in the following 30 days.  It was further agreed that Cobb would respond to the recovery schedule within two days, identifying whether it would or would not meet the dates specified by Hunt and (a) if so, detailing how it planned to meet the dates or (b) if not, when Cobb would in fact meet the dates.  Finally, it was agreed that Cobb would provide an inventory of all on-site materials yet to be installed and a fabrication and delivery schedule for all other materials needed to complete the Subcontract Work.  On September 7, 2016, Hunt sent a notice to Cobb listing those agreements and attaching the 30-day recovery schedule.

36.     On September 8, 2016, Cobb responded.  Cobb did not deny that its scope of work was behind schedule, but it denied that the delay was its fault and that it was obligated to comply with any "recovery" schedule.  Cobb stated that, instead, it would treat the recovery schedule as a request for "acceleration" under the Subcontract.  While the cost of recovery must be paid by the subcontractor, the cost of acceleration may, in appropriate circumstances, be paid by Hunt. Either way, however, the Subcontract entitles Hunt to require either recovery, or acceleration, or both.

37.     In an effort to resolve the mechanical and plumbing issues on the Fairmont Project, Hunt held a meeting at the job site on September 14, 2016 with executives of Cobb and Hunt. At the meeting, Cobb committed to certain dates and to meet with Hunt to develop a short-term schedule, including an increase in manpower.

38.     On October 11, 2016, Hunt issued a recovery re-baseline schedule.

39.     Cobb did not make good on its September 14 commitments.  A further meeting between Hunt and Cobb executives was held on October 25, 2016, at which time Cobb committed to provide by October 26 manpower loading for Hunt's October schedule, to provide an action plan for adequate manpower, and to define a quality assurance/quality control ("QA/QC") plan.

40.     Cobb did not provide all of the requested information by October 26.  Hunt then offered to give Cobb another 24 hours, but Cobb declined.  Thus, on October 26, 2016 Hunt sent to Cobb and Liberty Mutual a Notice of Default under the Subcontract.

41.     Cobb did not cure the defaults and did not adequately increase its qualified manpower on the site to meet the required schedule, and Cobb was still behind schedule in completing its activities.  Therefore, on November 2, 2016, Hunt served Cobb with another Notice of Default, providing the contractually required three-days' notice for Cobb to attain 100% of the schedule activities for which it was responsible to date.  The notice was simultaneously sent to Liberty Mutual.

42.     In addition to its delay-related issues, Cobb's work suffered from many defects in quality and failure to comply with the applicable specifications.

43.     On November 9, 2016, one of Cobb's quality issues came to the fore when a rainstorm caused significant damage to the work in place at the job site.  As the roof was not yet complete, Hunt had installed a temporary roof system to allow drywalling and other work to proceed despite inclement weather.  In performing its work, Cobb had occasion to unseal some of the temporary roof system.  At the end of each day, however, Cobb was required to identify areas it had unsealed so that they could be resealed.  Prior to the November 9 rain storm, Cobb failed to do that, allowing storm water to flow through the unsealed openings.  In addition, Cobb

had failed to connect storm water riser pipes properly, allowing storm water to flood areas that should have been protected.

44.     The situation did not improve, nor did Cobb cure its defaults.  On November 17, 2016, Hunt met with representatives of Liberty Mutual and the Fairmont Project's owner to inform them that Hunt intended to terminate Cobb's Subcontract in part, as the Subcontract's terms permitted.  Hunt asked the Liberty Mutual representatives whether Cobb could finish its work in time to allow completion of the Fairmont Project on August 9, 2017, as scheduled.  The Liberty Mutual representatives stated they did not believe Cobb could do so.

**Hunt Partially Terminates Cobb's Subcontract**

45.     In light of Cobb's continuing defaults, on November 18, 2016, Hunt sent Cobb and Liberty Mutual a Notice of Default of Subcontract Obligations and Notice of Termination (the "Termination Notice").  The Termination Notice listed three of the reasons why Cobb was then in default of its Subcontract obligations:

>       (a) Failure to supply sufficient labor, materials and supervision
>
>       (b) Failure to meet the Project Schedule
>
>       (c) Delay of other subcontractors on the Project

46.     Based on those defaults, Hunt's Termination Notice informed Cobb that Hunt had elected to exercise its right under the Subcontract to terminate the portion of Cobb's work that related to floors 1-7 of the Fairmont Project, constituting the Podium.  Thus, the Termination Notice directed Cobb to terminate its work on the Podium with three days and to continue its work on the Tower.

47.     Hunt's Termination Notice further informed Liberty Mutual that Hunt intended to arrange for performance of Cobb's obligations under the Subcontract with respect to the terminated work.

48.     Hunt retained a new subcontractor, Brandt Companies ("Brandt") to take over Cobb's contractual scope of work in the Podium, on which much work remained to be done.  Brandt additionally was responsible for remediating the many instances of Cobb's defective workmanship.  As a result, the cost to Hunt of Brandt's work significantly exceeds the amount that would have been payable to Cobb under its subcontract for the Podium work.

**Cobb improperly files a demand for arbitration**

49.     On December 7, 2016, Cobb served Hunt with a Notice of Claim asserting breach of the Subcontract based on wrongful termination and "acceleration access delay" and alleging $8,000,000 in damages.

50.     On December 30, 2016, Hunt responded to Cobb's Notice of Claim in great detail, rejecting Cobb's allegations.

51.     Section 34.3 of the Subcontract provides that Hunt shall have the right to determine the type of proceeding in which disputes between Hunt and Cobb are to be resolved:

> **Hunt's Right to Select Forum:**  The parties recognize that construction disputes often involve or potentially involve third parties such as the Owner, Designer, other Project subcontractors or sub-subcontractors, or third parties claiming damages as a result of the Project's construction operations, and that it promotes judicial/arbitral economy and consistency of results to resolve such disputes in a single forum.  In some of these cases, the underlying contracts may require litigation or arbitration of disputes, and for this reason and others, as between Hunt and Subcontractor, Hunt must have the sole and exclusive right to determine whether any dispute, controversy or claim arising out of or relating to this Subcontract, or breach thereof, shall be submitted to a court of law or arbitrated under the auspices of the American Arbitration Association . . . .  The venue of such court action or arbitration proceeding shall be in the jurisdiction in which the Project is located, or in Marion County, Indiana, as Hunt, to the extent permitted by applicable law, may (in its sole

discretion) elect to the exclusion of all other jurisdictions. The Subcontractor must make a written request to Hunt to determine whether the dispute shall be submitted to a court or to arbitration. Hunt shall respond to the Subcontractor's request within ten (10) business days after receipt thereof. Hunt's response shall identify whether the matter will be submitted to a court or arbitration proceeding selected by Hunt, to the exclusion of all other forums and jurisdictions. The Subcontractor waives any and all rights to contest Hunt's selection of forum, including, but not limited to, any rights based on forum non conveniens.

52.     Despite the parties' clear agreement, Cobb did not make a written request to Hunt to determine Hunt's preference for arbitration or litigation or as to the venue of either. Instead, in violation of the Subcontract, Cobb filed a Demand for Arbitration with the AAA on January 10, 2017, seeking "approx." $8,000,000. Cobb's Demand requested Austin, Texas as the hearing locale.

53.     Hunt promptly objected to Cobb's Arbitration Demand. On January 16, 2017, Hunt sent Cobb a letter demanding that Cobb withdraw its Demand for Arbitration for failure to comply with the Subcontract's provisions regarding dispute resolution. Cobb refused to do so.

**Liberty Mutual denies Hunt's claim under the Performance Bond**

54.     As noted above, Hunt provided Liberty Mutual with the notices of default and partial termination issued to Cobb with respect to the Podium work.

55.     For its part, subsequent to Cobb's partial termination, Liberty Mutual commissioned a consultant to evaluate Cobb's performance. Liberty Mutual's consultant and other Liberty Mutual personnel have frequently been on site at the Fairmont Project conducting what they have termed an "investigation."

56.     On January 25, 2017, Liberty Mutual's consultant issued a preliminary report accepting Cobb's version of the facts and entirely absolving Cobb of any responsibility for delays in the mechanical and plumbing scope on the Podium. Based in part on that report and on

other reasons, on January 31, 2017 Liberty Mutual sent Hunt a letter denying any claim Hunt might have under the Performance Bond.

57.     Liberty Mutual and its consultant continued to "investigate" on site at the Fairmont Project well after January 31, 2017.

**Cobb's continuing work on the Tower**

58.     Since November 2016, Cobb's ongoing contractual responsibilities have been restricted to work on the Tower.  Nevertheless, Cobb has fallen behind schedule and continues to perform defective work, at least some of which may remain to be discovered in the future.  On January 12, 2017, Hunt issued to Cobb a Notice of Default based on delays in its work on the Tower and on deficiencies in its work on the Tower, which required manpower to remediate and thus set Cobb further behind.

59.     In addition, Cobb and its Design Manager at Blum have issued revised Specifications for Cobb's scope of work without getting prior approval from Hunt and the Owner.  On information and belief, most of those changes have been intended to "bless," on a retroactive basis, the departures that Cobb had already made from the approved Specifications.  Work not performed according to the approved Specifications would be considered defective, and thus Cobb's and Blum's changes were inappropriately intended to reduce the amount of defective work Cobb is required to remediate.

60.     On February 7, 2017, Hunt issued a Required Schedule to ensure completion of the Fairmont Project by the contractual August 9, 2017 date.  In the Required Schedule, Hunt adopted most of Cobb's suggested activity durations and sequences for the Tower, though that required Hunt to compress the times other subcontractors would have to complete their work, potentially obligating Hunt to pay those subcontractors additional compensation for accelerating

their work.  Cobb has improperly refused to recognize the Required Schedule as binding and has fallen behind its required milestone dates.

## COUNT I
### (Breach of Contract against Cobb – Arbitration Forum)

61.     Hunt hereby incorporates paragraphs 1-53 above in this Count I as though fully restated herein.

62.     Under the Subcontract, Hunt has sole discretion to determine whether Cobb's claims shall be arbitrated or litigated.  Cobb breached the Subcontract's terms by filing an arbitration proceeding against Hunt without first seeking and obtaining Hunt's agreement to an arbitral forum.

63.     Hunt does not agree to an arbitral forum for resolving Cobb's claims and the claims Hunt has against Cobb.  Cobb's pursuit of an arbitral forum is a further breach of the subcontract's terms.

64.      Based on the Subcontract's terms and Cobb's breach, Hunt is entitled to an injunction staying the arbitration proceedings and requiring Cobb to dismiss its Demand for Arbitration without prejudice to its assertion of those claims in this Court.

## COUNT II
### (Breach of Contract against Cobb)

65.      Hunt hereby incorporates paragraphs 1-53 and 58-60 above in this Count II as though fully restated herein.

66.     Cobb has breached the Subcontract by refusing to comply with Hunt's schedule for the Fairmont Project, by refusing to provide adequate qualified manpower and supervision on the job, and by refusing to provide plans for recovering time lost.  Cobb had further breached the

Subcontract by failing to comply with the Project Specifications and by performing deficient work.

67.     Cobb's many delays and defective installations on both the Podium and the Tower have caused Hunt significant damages, presently in excess of $8 million and increasing every day.  Hunt currently projects that the damages may exceed $36 million by the time the Fairmont Project is completed, but that projection may be low.

**COUNT III**
(Declaratory Judgment against Cobb)

68.     Hunt hereby incorporates paragraphs 1-53 and 58-60 above in this Count III as though fully restated herein.

69.     Cobb has asserted that its partial termination by Hunt on November 18, 2016 was itself a breach of the Subcontract.

70.     Hunt's partial termination of Cobb on November 18, 2016 was justified by Cobb's breaches of contract and by the Subcontract's terms.

71.     Hunt is entitled to a declaration that the partial termination was proper under the applicable Subcontract terms.

**COUNT IV**
(Breach of Contract against Liberty Mutual)

72.     Hunt hereby incorporates paragraphs 1-57 above in this Count IV as though fully restated herein.

73.     The Performance Bond issued by Liberty Mutual for Hunt's benefit requires Liberty Mutual to pay the difference between the Subcontract Price between Hunt and Cobb and the

actual cost to complete and remediate Cobb's scope of work after Cobb's termination, up to the sum of $30,938,190.00.

74.     Hunt is the intended beneficiary of the Performance Bond issued by Liberty Mutual.

75.      Hunt has incurred substantial damages from Cobb's breaches of the Subcontract that resulted in partial termination by Hunt of the Subcontract, presently in excess of $8 million and continuing to rise every day.  Under the Performance Bond's terms, Liberty Mutual is obligated to indemnify Hunt for those damages.

76.     In breach of the Performance Bond's terms, Liberty Mutual has wrongfully denied any obligation to Hunt under the Performance Bond and has refused to pay anything to Hunt under the Performance Bond.

77.     Hunt is entitled to damages from Liberty Mutual, consisting of the amounts Liberty Mutual is obligated to pay under the Performance Bond.

## COUNT V
(Breach of Contract against Cobb - Professional Services Agreement)

78.     Hunt hereby incorporates paragraphs 1-11 and 59 above in this Count V as though fully restated herein.

79.     Hunt's general contract with the Owner provided that the mechanical, HVAC, and plumbing scopes of work on the Project were to be performed on a "design-build" basis.  In other words, Hunt was responsible to provide to the Owner both the design and the construction of those systems.

80.     The Professional Services Agreement ("PSA") between Hunt and Cobb obligated Cobb, as the "Consultant," to provide "the total design Mechanical, HVAC, and Plumbing systems for which [Hunt] is responsible" under Hunt's contract with the Owner, including "all

professional design services and all labor, materials and equipment used or incorporated in such design."  Further, Cobb agreed "to assume toward [Hunt] all the obligations and responsibilities which [Hunt], by the terms of the Contract Documents, assumes toward the Owner with respect to the design of the Project and the Services to be performed hereunder."  (PSA ¶ 1.10.)

81.    The PSA further provides that Cobb

> shall deliver to [Hunt], to the best of [Cobb's] knowledge, plans and specifications that conform to all applicable codes, rules, laws and regulations of all government entities that have jurisdiction over the Project, as well as all public and private utility regulations and codes, and any existing drawings and specifications, including those attached hereto as Exhibit G.  (PSA ¶ 1.11.1.)

In addition, the PSA provides that

> After review and written approval of the Design Development Phase Documents by Design/BuilderArchitect of Record, [Cobb] shall prepare final Project construction documents and specifications ("Construction Documents") setting forth in detail the requirements for construction of the Work (as such term is defined in the [Hunt-Owner] Contract), which will be suitable for permitting within the jurisdiction of the Project, purchasing of complete, coordinated, operational systems and of a quality level to support the timely performance of physical construction installation and sequencing of the multiple systems involved. (PSA ¶ 1.12.3.)

82.    The PSA provides that Cobb was to perform and complete its services "in accordance with the Project Schedule attached hereto and made a part hereof as Exhibit B, as said Project Schedule may be modified or amended from time to time by [Hunt], in its sole discretion.  Time is of the essence with respect to the performance of this Agreement."  (PSA ¶ 4.1.)

83.    The agreed compensation to Cobb under the PSA for its basic services was $450,000. (PSA ¶ 5.2.3.1.)

84.    Hunt has performed its obligations to Cobb under the PSA.

85.     Cobb has breached the PSA in several ways, including: defective design, failure to complete the design, late completion of the design, and retroactive changes to the specifications to "bless" work by Cobb that did not comply with the Project specifications.  Examples of Cobb's breaches include:

(a)     insufficient design of the cooling requirements for certain fan coil units ("FCUs");

(b)     incorrect re-design of the FCUs such that it required an oversized set of heating coils, resulting in a potential power overload to the previously designed electrical system and power load and requiring alterations in the FCUs after they had been installed;

(c)     incorrect design of the ventilation and air supply to the boiler room per the State Boiler Inspector Report;

(d)     approval of Cobb's use of multiple manufacturers' press fittings, when the original Project specifications required the use of a single brand of Viega ProPress press fitting;

(e)     approval of Cobb's submittal for purchase of FCUs that did not or could not meet the Project's specifications for noise levels;

(f)     failure to specify or design in a timely manner the correct number of duct detectors for fan power boxes as required by code;

(g)     incorrect design of the expansion tank;

(h)     incorrect design of the generator exhaust system;

(i)     incorrect sizing of the groundwater sump pump;

(j)     incorrect design and overhead clearance of the elevator machine room fan coil;

(k)     incorrect location of elevator machine room thermostat;

(l)     incorrect routing of chilled water line over the fan coil unit on Level 8;

(m)     incorrect design of air handling units on the roof; and

(n)     failure to obtain insurance of the type described in paragraph 9.1 of the PSA.

86.     As a result of Cobb's breaches of the PSA, some of which may not yet have been discovered by Hunt, Hunt has been damaged in an amount to be proven at trial.

**COUNT VI**
(Breach of Fiduciary Duty against Cobb – Professional Services Agreement)

87.     Hunt hereby incorporates paragraphs 1-11, 59, and 79-86 above in this Count VI as though fully restated herein.

88.     The PSA provides that Cobb "shall promote the best interest of [Hunt] and assume towards [Hunt] a fiduciary relationship of the highest trust, confidence, and fair dealing." (PSA ¶ 17.1.)

89.     Cobb has breached its fiduciary duty to Hunt under the PSA by favoring its own interests as subcontractor over Hunt's interests.  Thus, Cobb as Consultant under the PSA has retroactively changed the Project specifications so that work by Cobb as subcontractor that did not meet the Project specifications would not need to be remediated by Cobb at its expense.

90.     For example, although the original Project specifications as approved by the Owner required Cobb to use only Viega Propress pipe fittings, a high-quality product, Cobb in fact used a variety of other brands, and Cobb then changed the specification to "bless" what Cobb had done.  Apart from the issue of product quality, the use of multiple brands of fittings creates potential maintenance and repair problems, as each brand requires its own types of tools.

91.     Another example is Cobb's approval of Cobb's own submittal for the purchase of FCUs that did not or could not meet the Project's noise specifications.  Cobb has used its own approval of the FCUs as an excuse to evade its obligation to remediate the many FCUs at the Project that exceed the specified noise limits.

92.     As a result of Cobb's breaches of its fiduciary duty under the PSA, some of which may not yet have been discovered by Hunt, Hunt has been damaged in an amount to be proven at trial.

**COUNT VII**
(Fraud against Cobb)

93.     Hunt hereby incorporates paragraphs 1-11, 13, 25-27, 31, and 58 above in this Count VII as though fully restated herein.

94.     In the Subcontract, Cobb represented to Hunt that it had "investigated and satisfied itself with respect to . . . the availability and adequacy of personnel and workers and the prevailing wage scales . . . ."  (Subcontract § 3.5.)

95.     Further, in the Subcontract Cobb represented and warranted to Hunt that it "is experienced in performing the type, quality and quantity of work required for performance of this Subcontract, . . . and has sufficient management, supervision and labor capacity to properly perform this Subcontract."  (Subcontract § 3.9.)

96.     Contrary to those representations and warranties, Cobb did not have adequate personnel and workers at the prevailing wage scales to work on the Project, nor did it have sufficient management and labor capacity to perform the Subcontract.  Rather, it consistently short-staffed the Project and relied on day-labor agencies for staffing, which did not and could not provide the numbers of qualified staff necessary for a project of this type and scope.

97.     Cobb thus fraudulently induced Hunt to enter into the Subcontract by falsely representing and warranting to Hunt that it would be able to staff the Project at levels required to perform the Subcontract.  Cobb did not in good-faith believe that it could provide sufficient numbers of qualified personnel at the wages it was willing to pay, and in fact it was unable to do so.

98.     The Subcontract should, therefore be rescinded, and Hunt should be entitled to its out of-pocket or benefit-of-the-bargain damages in an amount to be proven at trial, plus punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Hunt prays that this Court award the following relief:

(a)     As against Cobb, an injunction staying the pending arbitration proceeding brought against Hunt by Cobb and requiring Cobb to dismiss its arbitration claim without prejudice to reassertion of its claims in this Court.

(b)     As against Cobb, an award of damages as may be proved at trial, but in no event less than $36 million.

(c)     As against Cobb, a declaration that Hunt's partial termination of the Subcontract on November 18, 2016 with respect to the Podium scope of work was justified and according to the Subcontract's terms.

(d)     As against Liberty Mutual, an award of damages as may be proved at trial, but in no event less than $36 million.

(e)     As against Cobb, disgorgement of fees paid to Cobb as Consultant under the PSA and damages for breach of the PSA.

(f)     As against Cobb, a declaration that the Subcontract is rescinded based on fraud in the inducement.

(g)     As against Cobb, damages for fraud as may be proved at trial, but in no event less than $36 million.

(g)     As against Cobb, punitive damages for fraud in an amount no less than $36 million.

(h)     As against Cobb and Liberty Mutual, Hunt's reasonable attorneys' fees and costs.

27

(i)     As against Cobb and Liberty Mutual, such other and further relief as this Court deems equitable and just.

Respectfully submitted,

HUNT CONSTRUCTION GROUP, INC.

By: /s/ *Casey Low*
               One of its Attorneys

Casey Low
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
401 Congress Avenue
Suite 1700
Austin, Texas 78701
(512) 580-9616
Casey.Low@pillsburylaw.com

Steven G.M. Stein (admitted *pro hac vice*)
C. Steven Tomashefsky (admitted *pro hac vice*)
Andrew J. Donivan (admitted *pro hac vice*)
STEIN RAY LLP
222 West Adams St.
Suite 1800
Chicago, Illinois  60606
(312) 641-3700
sstein@steinraylaw.com
stomashefsky@steinraylaw.com
adonivan@steinraylaw.com