**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **HUNT CONSTRUCTION GROUP, INC.,**<br>    **an Indiana corporation,** | § § § | |
| **Plaintiff,** | § § | **Case No. 1:CV-17-215** |
| **v.** | § § | |
| **COBB MECHANICAL CONTRACTORS, INC.,**<br>**a Colorado corporation,** | § § § § | |
| **and** | § § | |
| **LIBERTY MUTUAL INSURANCE COMPANY, a**<br>    **Massachusetts corporation,** | § § § | |
| **Defendants.** | § § | |

**DEFENDANT COBB MECHANICAL CONTRACTORS, INC.'S
SECOND AMENDED COUNTERCLAIM**

Defendant Cobb Mechanical Contractors, Inc. ("Cobb") files the following Second Amended Complaint.

**I.
INTRODUCTION**

1.      On January 31, 2018, pursuant to this Court's scheduling order, Cobb filed its First Amended Answer to Plaintiff's Complaint and Amended Counterclaim. Subsequently, on February 2, 2018, Hunt filed its Amended Complaint for Injunctive and Other Relief. On February 12, 2018, Cobb filed its First Amended Answer to Plaintiff's First Amended Complaint. That filing did not re-plead Cobb's Amended Counterclaim.

2.      In an abundance of caution, Cobb is repleading its Amended Counterclaim in response to Hunt's Amended Complaint. Cobb's Second Amended Counterclaim, set out below, is identical to the Amended Counterclaim it filed on January 31, 2018. Cobb makes this filing

under Federal Rule of Civil Procedure 13(a).   The claims asserted herein are compulsory counterclaims that arise out of the transaction or occurrence that is the subject matter of the Plaintiff's claims.

## II.
## SECOND AMENDED COUNTERCLAIM

### Factual Background

***A.      The Fairmont Project and the Parties' Subcontract.***

3.      The Fairmont Project (the "Project") is a luxury hotel located in Austin, Texas.  It consists of a seven-story "Podium" topped by a 31-story "Tower."   The Podium contains meeting rooms, spa, pool, concierge, and other amenities.  The Tower contains individual guest rooms.  The Fairmont Hotel is currently uncompleted and seriously behind schedule.

4.      Hunt is the general contractor/construction manager on the Project.  As such, it was exclusively responsible for managing the subcontractors on the Project and coordinating with the Owner.  It was also responsible for maintaining the Project site and ensuring that all of the subcontractors had access to the site, including access to the 30-story Tower.

5.      Cobb is an experienced contractor for plumbing and mechanical systems. Cobb has been in business for nearly fifty years.  It prepared a detailed analysis of the necessary labor, materials, and supervisors required for the plumbing and mechanical systems in the Project. Cobb also took into account certain preliminary scheduling information provided by Hunt during the proposal phase.  Cobb based its bid upon and in reliance upon the information that Hunt provided and communications with Hunt personnel.   Cobb bid the Project, and executed the Subcontract, on the basis of this analysis.   It thus reasonably expected that the actual jobsite conditions would be consistent with those described and represented by Hunt.

6.      During the Subcontract negotiations, the parties could not come to a final agreement on a number of issues.  In an effort to reach conclusion and move forward, the Parties decided to use the Hunt – Owner Contract as a "touchstone" and to ensure that Cobb would not be prejudiced or held to the more unreasonable or stringent terms of the Hunt subcontract form. Specifically, the Parties agreed to make Attachment IV a part of the Subcontract. Attachment IV states that "[i]n the event there is a conflict in terms between this Subcontract Agreement and Hunts Contract with Owner, it is hereby agreed that the less stringent terms to the two documents shall take precedence."   In short, this provision ensures that the Subcontract is no more restrictive to Cobb than the Hunt – Owner Contract is to Hunt.  This Attachment was added to the Subcontract to protect Cobb from certain overly stringent provisions in the Subcontract.  One such example concerns the right to terminate in part.  The Hunt – Owner Contract does not give a broad right to partially terminate.  As such, Hunt does not have the right to partially terminate Cobb, as any additional right to terminate in part is more stringent and thus is not applicable.

7.      The Parties entered into a July 20, 2015 Subcontract.  Cobb agreed to construct and install the mechanical and plumbing systems in the Podium and Tower.  In exchange, Cobb was to be paid a "Subcontract Sum" of $30,938,190 for the subcontract scope of work, which amount was to be paid out periodically through Progress Payment Applications that were to be submitted by Cobb to Hunt.

8.      The Subcontract noted that "time is of the essence in this Subcontract."   It required Cobb to "participate and coordinate" in the development of the Project Schedule.   It further stated that:

> Subcontractor's Schedule:  As described throughout the Subcontract, time is of the essence in the prosecution of Subcontractor's Work.  Subcontractor will complete the work as set forth in the **mutually agreed upon CPM schedule**.

9.      The requirement that the schedule be mutually agreed upon was a material condition precedent to Cobb's ability to properly perform its obligations under the Subcontract. Without a mutually agreed upon CPM Schedule, Cobb is unable to efficiently and effectively perform its duties.  The same holds true with respect to the other subcontractors on the Project. An effective CPM schedule is required in order to properly sequence and complete the various trade works and to establish overall task durations, and then to properly plan and manage the work.  Cobb would not have executed the Parties' Subcontract if it had not included this requirement.

**B.      *The Parties never reached a mutually agreed upon CPM schedule.***

10.      Throughout the Project, Hunt failed to communicate and cooperate with Cobb and other subcontractors regarding the schedule.  Hunt never provided a workable mutually agreed upon CPM Schedule to Cobb.  The initial schedules that Hunt provided to Cobb contained numerous scheduling and logic errors, missing activities, missing predecessors/successors and inaccurate durations.  Moreover, the critical activity paths on the existing Hunt schedules were flawed and dysfunctional due to the improper sequencing and missing task dependencies.

11.      Cobb repeatedly offered to work with Hunt in order to fix these scheduling issues and create a mutually agreeable CPM Schedule.  Given the numerous errors in Hunt's proposed CPM Schedule, Cobb believed that the Parties should meet in person to create a new workable CPM Schedule.  Cobb repeatedly requested these meetings with Hunt. Cobb's offers fell upon deaf ears, however, as Hunt refused to engage in meaningful CPM scheduling discussions.

12.      Hunt also failed to provide native project schedules and updates to Cobb throughout the Project.  The Project record contains numerous written requests by Cobb to Hunt for the necessary scheduling materials.  Cobb's repeated requests explained that Cobb needed

4

this native format scheduling information in order to properly evaluate Hunt's sequences and provide Hunt the proper information to allow Cobb to properly execute its work. Hunt consistently ignored and refused Cobb's requests, and as a result, Cobb was kept in the dark as to the actual Project schedule.

13.     Other subcontractors also complained about the lack of a constructible Project CPM Schedule, and requested updated schedules during the subcontractor meetings. While Hunt would promise updated schedules were forthcoming, all it provided were infrequent short interval schedules, which were insufficient. Examples of other subcontractors raising complaints regarding the schedule and out of sequence work, etc. include, by way of example:

- Sheet Rock Subcontractor in the Podium complained they were brought on 3 months premature by Hunt putting their work out of sequence;

- Berg Electric – was very vocal about the schedule and lack thereof;

- All subcontractors complained weekly in the Subcontractor Coordination meetings and MEP meetings that Hunt was not giving the subcontractors their allotted time and agreed to time for layout on decks prior to concrete pours;

- Otis Elevator – Had several complaints with Hunt not completing predecessor work and ordering of materials that Hunt was responsible for ordering preventing Otis from completing their work;

- North Star – Fire Protection Subcontractor complained continually to Hunt about out of sequence work;

- All Subcontractors complained about the issuance of Bulletins – timeliness of them being issued, issued in multiple iterations, how this affected the sign off of the BIM process and ultimately affected approved shop drawings by each trade. This also affected the layout of items in concrete pours such as sleeves, drains, and floor sinks which often located items in the wrong location causing multiple delays, which required scanning of concrete and core drilling/saw cutting of the concrete. This was difficult due to Post Tension cables in the concrete pours; and,

- Complaints by all Subcontractors regarding resolution and issuance of change orders to all subs.

**C.      The Project was delayed from the start through no fault of Cobb.**

14.      The Project had troubles long before Cobb started work.  At the start of the Project, for example, Hunt did not timely complete the necessary excavation, concrete, and structural steel foundation work for the Podium and Tower.  In other words, Hunt did not complete the necessary structural work that preceded all of the other trades' work.  These delays impacted all follow-on work.  Similarly, Hunt did not plan and procure in a timely fashion the right of way permits to work on public roads to connect critical utility systems necessary to support the construction of the project.

15.      As a result, Cobb's starting date on the Project moved from February 1, 2016 to May 9, 2016 yet the finish date did not move.

16.      The result of these early failures was to increase Cobb's labor, direct costs and indirect costs due to the increased period of performance and disrupted and out of sequence work, as well as stacking of Cobb's work with work of other trades.  At one point, Hunt issued a schedule revision that was intended to accelerate and stack work in an effort to make up the time Hunt had lost during the early stages of the project.

**D.      Hunt failed to properly manage the Project.**

17.      Throughout the Project, Hunt failed to properly manage the Project.  As the General Contractor on the Project, Hunt had the responsibility to manage and coordinate all of the subcontractors on the Project, ensure that the subcontractors had full access to the Project site, and maintain the Project site.  Hunt failed on all counts.

**1.      Hunt failed to properly manage, schedule, and sequence the subcontractor work on the Project.**

18.      The lack of a mutually agreeable CPM schedule led to a number of Project management issues.  Hunt was unable to properly manage, schedule, and sequence the

subcontractor work on the Project, including the predecessor work that must be completed before Cobb's work could commence and the successor work that was required to follow.  With no constructible CPM Schedule, it was a "free for all", and there was little, if any, coordination between the various subcontractors. The CPM schedule was a meaningless public relations document that did not accurately depict the required work tasks, sequences, and/or durations or predict an accurate achievable finish date for the project or for individual major milestones of the work.

19.    Another example of Hunt's failures concerned its failure or refusal to understand the inspections process in the Tower, especially in regard to third party inspectors (i.e. arranged by owner).  This includes the inspections of the So-Vent System and the multiple City of Austin inspections required by both the Plumbing and Mechanical/HVAC sides.  Cobb attempted to assist by providing a fragnet schedule to Hunt depicting these activities in the Tower, but Hunt failed to incorporate this into the schedule.

20.    Hunt's failure to coordinate work among subcontractors and failure to provide adequate scheduling and sequencing/coordination of trades meant that Cobb was on its own with respect to the other subcontractors.  Cobb was forced to try and independently coordinate its work with other subcontractors absent the guidance of a responsible general contractor.  This highly inefficient process cost Cobb valuable time that it should have used to complete Cobb's scope of work.  This also significantly increased Cobb's costs.  Moreover, this process failed to meet industry standard for a project of this size and scope.  As a result, there was at most only sporadic coordination between the various subcontractors by Hunt; and, it was left to the subcontractors to try and accomplish this in the field amongst the various subcontractors without any help from Hunt.

21.     This led to Cobb having to perform out of sequence work and duplicative work. Cobb's mechanical work must proceed in a logical sequence.  Not only must Cobb's work fit into the sequence of Cobb's various plumbing and mechanical tasks, but it must also fit into the general construction sequence.  Cobb's work is very much dependent upon and driven by various predecessor tasks/trades.  There was no such sequence, and as a result Cobb was forced to perform work out of sequence, wait for predecessor work to be completed, and, at times, complete the same work twice.  This negatively impacted Cobb's productivity and drastically increased Cobb's costs of performance, and it extended the time required in which to complete such various work activities.

22.     The incomplete design ie. numerous RFIs, lack of shop drawings by other contractors for example the kitchen subcontractor and the numerous bulletins and multiple issuance of most all bulletins negatively impacted the following steps.

- The BIM Model could not be completed and signed off timely.

- This affected final shop drawings that had to be done in steps and chunks,

- Next they had to be approved by the Architect/Engineer.

- Finally, when approved downloaded by the sheet metal fabrication shop to build the duct.

23.     Hunt also changed up the flow of how they were building the project.  Initially and as bid they were building from the ground up and when they ran into problems with the Podium levels they announced in the field that they decided to skip lower levels and start on level 3 and work up the tower.

24.     This had a huge effect on BIM Modeling, a major kink in the already planned shop drawings and switching up our fabrication schedule Cobb's shop that was already in the works for the lower levels.

25.     This in turn had a tremendous impact to drawings, fabrication, material delivery, work installation, and out of sequence work with all trades.  This also created problems with storing duct and other materials of floors and costing Cobb additions time and money to continually move these items which also meant other trades now had their materials stockpiled in areas where Cobb needed to work creating obstacles on every floor.

26.     Cobb was not the only subcontractor that complained about the lack of coordination and direction on the Project.   Other subcontractors that complained about this included: Berg Electric, Stohl Drywall, Otis Elevator, North Star Fire Protection, Alamo Tile & Stone, Cherry Paint, Brandt, Meyer Concrete, Simplex Grinnell, Tile Quote, Austin Energy, and Trimark USA.

**2.     Acceleration of Cobb's work.**

27.     The failure to schedule and coordinate construction led to the acceleration of Cobb's work.  Because of the unreliability and inadequacy of the construction schedule, there was never a steady flow of work for Cobb.  Instead, Cobb spent most of its time trying to chase Hunt's constantly changing deadlines and jumping from area to area.  As a result, Cobb was forced to provide workers well in excess of its initial determination and forced to pay overtime wages.  In short, Hunt's actions and failures to act, and its substandard and ineffective project management, delayed the completion of Cobb's work.  However, Hunt failed and refused to grant Cobb the required schedule extension and instead insisted that Cobb complete its work by what was in reality an artificially premature completion date.  This constituted a constructive

9

acceleration of Cobb's work, and Cobb was never compensated for this constructive acceleration.

28.     Again, Cobb was not the only subcontractor whose work was accelerated.

**3.     Project site access issues.**

29.     Hunt failed to provide Cobb with adequate site access.  The Podium is seven stories; the Tower is 31 stories.  Given this configuration, Cobb had to utilize the on-site cranes and hoists/lifts in order to move its men and materials and access the work areas.  Hunt was required to provide hoists and cranes necessary for this access.  Without access to the on-site cranes and hoists/lifts, Cobb could not complete its work.  Thus, it was important that Cobb have timely/coordinated access to these resources throughout the Project.  However, the man hoists and material hoists were often broken down and not reliable.  This was a huge impact on Cobb's productivity and made Cobb's work very inefficient.

30.     In addition, Porta Johns were continually full, disgusting, and very seldom cleaned.  They also had a deficient number for the size of the work force for all trades, especially after Hunt accelerated the project.

31.     Hunt did not provide timely adequate access to the on-site cranes and hoists/lifts.

32.     For example, Cobb tried to scheduled crane time with Hunt's on-site supervision. Hunt gave preferential treatment to other subcontractors and ignored Cobb's previously scheduled reserved crane time.  As happened numerous times during the Project, Cobb would give Hunt several weeks' notice of its need for the on-site crane, and Hunt would affirm Cobb's request.  When it was time for Cobb to access the crane, however, Hunt told Cobb that there was no access.  In some instances, Cobb had to pay other subcontractors to use the crane during their allotted time, or to pay the crane operator to provide the lifts.

33.     When Cobb coordinated delivery of several Air Handling Units, Cobb was forced to re-route them and store them in Cobb's Round Rock Yard, approximately 20 miles away from the job site, where Cobb stored the units for several months because Hunt could not get the concrete pads poured for Cobb to set the units.  Once the concrete was poured, they then continued with the structure not allowing Cobb to directly set the AHUs.

34.     The intermittent crane availability made it difficult for Cobb to efficiently complete its work on the Project.  Cobb wasted considerable time scheduling, and waiting for, crane availability.  This resulted in decreased productivity.

35.     A similar situation occurred with respect to the buck hoists on the Project.  The buck hoists were used to transport workers from the ground level to the various levels of the project.  Hunt failed to maintain functional and safe buck hoists throughout the tenure of the Project.  As a result, the buck hoists ran intermittently.  When the buck hoists were functional, there were long lines of workers on a daily basis who were forced to wait in line to access the buck hoists.  This resulted in wasted time.  When the buck hoists did not work, workers on the Project were forced to use the stairs in order to access their work areas, most of which were on the 6th to 37th floors of the Tower.  Again, this failure resulted in more wasted time.

36.     The quantity of hoists was inadequate for this project.  There should have been twice as many as were provided.

37.     Hunt's failure to maintain a functional buck hoists resulted in lost productivity and lost time on all material handling activities.  Cobb wasted considerable time scheduling, and waiting for, buck hoist availability.  Cobb personnel also wasted considerable time walking the stairs up to the 37 floors of the Tower.  This resulted in decreased productivity.

### 4.   Other site management issues.

38.     Hunt continuously changed the conditions for Cobb's workers.  For example, Hunt prohibited Cobb's workers from eating in the building during their breaks.  This meant that Cobb's workers would have to spend time traveling down the building (see above discussion re: inefficiency of buck hoists, etc.) to eat, and then traveling back up to their respective work levels.  This is very unusual for this type of construction project, and this development was not contemplated at the time Cobb finalized it price for the work.  This resulted in wasted time and decreased worker productivity.

39.     Hunt also failed to provide workers with adequate sanitary facilities on the upper floors of the building.  This forced workers to have to walk down and back up multiple levels each day just to try to find, and use, the restroom. Cobb resorted to starting a worker an hour early every day to survey the tower and identify the locations of the facilities to share with the team so they were not "searching" for a place to relieve themselves.  In addition to the lack of sufficient quantity of facilities, the facilities that were provided were never serviced at the proper intervals resulting in unsanitary overflowing conditions and facilities without tissue paper.  Even on the ground floor, Hunt failed to maintain the sanitary facilities on a regular basis.  This resulted in wasted time and decreased worker productivity.

### E.   *Hunt improperly terminated Cobb.*

40.     On November 18, 2016, Hunt issued a partial termination of the Subcontract.  In particular, Hunt terminated Cobb's work in the Podium.  The Terminated Work included the following:

> All Mechanical and Plumbing Work in the Podium (Level Seven and Below).  A more detailed scope of work will be further defined upon a joint meeting between Cobb and Hunt that is planned to happen no later than Monday November 21, 2016.

The stated reasons for this partial termination were:

- Cobb's alleged failure to supply sufficient labor, materials and supervision;

- Cobb's alleged failure to meet the Project Schedule; and

- Cobb's alleged delay of other subcontractors on the Project.

41.     None of these stated rationales are accurate or provide justification for Hunt's termination of Cobb's Subcontract.  Cobb prepared a detailed analysis of the necessary labor, materials, and supervisors required based on the bid information provided by Hunt and called for in the Contract Documents.  Cobb complied with these requirements in spite of Hunt's failure to coordinate work among the subcontractors and provide a steady flow of available work to Cobb. In fact, Cobb often utilized crew sizes that were much larger than originally expected under the information initially provided by Hunt.  Cobb did not fail to supply sufficient labor, materials, or supervision.

42.     Hunt's complaint about the "Project Schedule" is confusing.  Hunt never provided a workable Project schedule and refused to work with Cobb on a mutually agreeable CPM Schedule.  There was never the contractually required mutually agreed schedule.  Cobb could not meet a "Project Schedule" that did not exist.  Moreover, Hunt has never identified: (1) which specific schedule(s) Cobb allegedly delayed; or (2) exactly how Cobb failed to meet the "Project Schedule."

43.     Likewise, Hunt's claim that Cobb somehow impacted other subcontractors is absurd given Hunt's failure to provide a workable Project schedule and mismanagement of the Project.  In fact, Cobb consistently attempted to coordinate its work with the other subcontractors that were similarly suffering from Hunt's inadequate scheduling and extreme lack of

13

communication.  Any alleged issues with subcontractors have been caused by Hunt's inability to properly schedule and sequence/coordinate its various trade subcontractors.

44.     Cobb was harmed by Hunt's improper partial termination.  In particular, Cobb incurred additional costs as a result of Hunt's improper partial termination.  Cobb also lost the overhead and profit that it would have received had it been allowed to complete the Podium work.

**F.     *Hunt replaces Cobb with Brandt.***

45.     Hunt assigned Cobb's remaining Podium work to Brandt Companies ("Brandt"). On November 18, 2016, Brandt assumed responsibility for completing the mechanical and plumbing work in the Podium.  However, it then took Brandt more than six weeks to come up to speed and staff the project before they began installing any measurable volume of work further contributing to overall project delays.  This represented a waste of hundreds of man-days or production in lost time.

46.     Brandt's work on the Podium has been inefficient and cost Hunt more money than Cobb would have charged for the same work.  For example, Hunt contracted with Brandt on a time and materials basis.  Not surprisingly, this has led to astronomical costs for the above replacement work.  It appears that Brandt has treated this work as a blank check to enrich Brandt at the detriment of Hunt and Cobb.  Brandt's charges are considerably higher than the amount Cobb would have charged if it had been allowed to complete the work in the Podium. In fact, it appears that the Brandt charges for the podium exceed Cobb's entire contract amount.  Brandt's actions were not reasonable in many respects, such as Brandt throwing out most of Cobb's materials and fabricated duct work for the podium for no reason.  It appears that neither Hunt not Brandt did anything to try and mitigate and control the costs of completing this work.

*HOU 408769952v1*

**G.**     ***Hunt removes controls and test and balancing from Cobb's scope of work.***

47.     When Hunt improperly terminated Cobb's work on the Podium, Cobb's scope of work still included the controls work and the testing and balancing work for the entire Project. Cobb repeatedly asked Hunt for direction with regard to the controls work and the testing and balancing work.  Hunt did not respond to Cobb.  Cobb thus correctly assumed that it was still responsible for the controls work and the testing and balancing work.  Among other things, Cobb continued to perform and bill Hunt for this work.

48.     On June 15, 2017, Hunt informed Cobb, for the first time, that the controls and testing and balancing work on the Project were no longer within Cobb's scope of work.  This was seven months after its improper partial termination.  This decision applied to all of the testing and balancing work on the Project, including such work to be performed in the Tower. Hunt decided to re-subcontract this work through its own controls and testing and balancing subcontractor.

49.     This last-minute change was counterproductive and added unwarranted and unnecessary costs**.**  Hunts' unnecessary re-subcontracting plan cost more than it would have to simply allow the Cobb subcontractors to complete the controls and testing and balancing work on the Project under Cobb's existing subcontracts.

**H.**     ***Hunt's mismanagement of the Project was even worse after Cobb's improper termination.***

50.     Hunt's mismanagement continued, and in fact worsened, after Cobb's improper partial termination.  After this improper partial termination, Cobb worked only on the Tower. Subcontractor work in the Tower following termination was uncoordinated and mismanaged by Hunt.  As a result, Cobb continued to suffer from the same deficiencies it experienced pre-termination.  As before, Hunt has improperly accelerated Cobb's work, and this acceleration has

15

caused Cobb to add overtime, additional shifts, additional supervision, and additional equipment rental.

51.     Hunt's mismanagement, demands, constructive acceleration, and material unilateral changes to the Subcontract have increased Cobb's construction labor costs for overtime, additional shifts, and/or manpower.  Hunt's breaches have also caused Cobb to incur increased costs for additional equipment and maintenance.   In addition, Cobb has incurred additional costs associated with expending labor and equipment orders, increasing supervision, losing efficiency and productivity, and other increased job site and home office expenses which are directly related to Hunt's acceleration of Cobb's work.

**1.     The Site access/site condition issues continued.**

52.     The site access and management issues discussed above continued after Cobb's improper termination.  These issues also continued to adversely affect Cobb's productivity.

**2.     Hunt failed to timely deliver permanent power.**

53.     Hunt was responsible for providing permanent power for the Project.  It failed to timely do so.  Since its inception, the Project used temporary power to provide lighting, small tool charging, and other non-permanent system operations.   Cobb (and Brandt) could not, however, use temporary power to run the air handling equipment on the Project.  Doing so would risk damage to these systems.  Cobb also could not operate fan coil units, outside air handling units, icemakers, water heaters, booster pumps, boilers, sewage ejectors, lift stations, and recirculation pumps without permanent power.

54.     This permanent power was also necessary for the other trades on the Project.  For example, the elevator subcontractor would not operate the elevators without permanent power. This resulted in a delay of the availability of the elevators to workers on the Project.  The lack of

permanent power also hindered the electrical, subcontractors, and delayed Brandt from starting all the major mechanical systems of the project (that were previously in Cobb's subcontract) which delayed the availability of cooling/heating in the entire building and domestic water to the Tower since booster pumps could not run.

55.     Hunt did not provide permanent power to the Project until July 5, 2017, eleven months late.  Hunt's failure to timely provide permanent power prevented Cobb from completing its work on time and in a productive manner.  It also precluded other trades from completing their work on time and in a productive manner.

### 3.     Hunt failed to timely provide permanent domestic water.

56.     Hunt was responsible for supplying permanent domestic water to the building. Permanent domestic water was required in order for Cobb to properly install and test plumbing fixtures, conduct testing and setup of pressure reducing valves, install icemakers, perform chlorination, and to conduct final inspection and operational testing of plumbing systems. Permanent domestic water at the appropriate design flow and pressure is also required in order to finalize bathroom fixtures to ensure that each fixture functions properly, to ensure supply and waste connections are water-tight, and to caulk fixtures.

57.     Hunt did not provide permanent domestic water to the Project until July 5, 2017, over ten months late.  Hunt's failure to timely provide permanent domestic water prevented Cobb from completing its work on time and in a productive manner.

### 4.     Hunt failed to timely provide chilled water connections.

58.     Hunt was responsible for completing the chilled water connections to the project as a whole, serving the tower and the podium.  These connections are necessary for Cobb to start

17

up and check/test fan coil units, outside air handling units, and icemakers. These pieces of equipment must be started in order to begin to perform testing and balancing, as well as to conduct controls testing activities as well as final operational testing of all Cobb's systems. Cooling also provides a means of humidity control in the building that is necessary for application and curing of wall finish compounds. The lack of cooling and humidity control caused over double the cure time for wall finish compounds further delaying painting and wall covering activities which are predecessors to all trim activities. Lack of chilled water also delayed start-up of walk in coolers and cooling required in electrical rooms and elevator equipment rooms for start-up of the permanent elevators for construction use.

59.     Chilled water connections were not available until July 6, 2017, six months late. Hunt's failure to timely provide chilled water connections prevented Cobb from completing its work on time and in a productive manner.

**5.      Hunt failed to timely provide domestic hot water to Tower.**

60.     Hunt was responsible for providing domestic hot water to the Tower. Cobb needed hot water to properly test, inspect, and verify operation of plumbing fixtures such as lavatories, showers and bathtubs.

61.     Hunt did not provide domestic hot water until December 7, 2017, many months late. Even then, there were problems with the recirculation system until Cobb worked with Blum to determine the proper pump turndown to maintain flows. This was resolved on December 27, 2017 – fifteen months late. As a result, Cobb could not timely complete the above referenced work. Cobb had to revisit every fixture in every room in the Tower once the hot water became available costing Cobb significant time and money because of the late delivery of domestic hot water by Hunt.

### I.       *Hunt has not paid Cobb for its work.*

62.      Hunt has not paid Cobb for all of Cobb's work on the Project.   Cobb has submitted all of the paperwork required under the Subcontract.   Instead of paying the proper amount to Cobb, Hunt has consistently withheld part of the payment due to Cobb with absolutely no justification.

63.      As a result of this non-payment, Cobb has filed four Liens against the Fairmont Hotel:

| Affidavit | Amount of Lien | Date of Filing Affidavit | Notice to Owner |
|-----------|----------------|--------------------------|-----------------|
| No. 1 | $2,063,970 | October 9,  2017 | October   2017 |
| No. 2 | $52,662.50 | December 11, 2017 | December 13, 2017 |
| No. 3 | $94,536 | December 11, 2017 | December 13, 2017 |
| No. 4 | $115,892.10 | January 17, 2018 | January 19, 2018 |

64.      Cobb has not been paid any of the above amounts, and Cobb does not expect to be paid this amount based upon Hunt's failures and refusals.  Cobb will continue to file lien notices for any invoiced amounts not paid timely by Hunt.  There are additional amounts owed as well, including retainage.

### J.       *Hunt cannot finish the Fairmont Hotel.*

65.      It has become clear that Hunt may not be able to finish the Fairmont Hotel.  The Owner of the Fairmont Hotel has had to postpone the opening date multiple times, and Hunt has failed to meet any of the deadlines for completing the Fairmont Hotel.  There is no end in sight, and as of this filing, no one knows when the Fairmont Hotel is going to be completed because

Hunt has failed to publish an updated schedule that clearly shows a new substantial completion date.

66.     In addition, the substantial completion date has continually slipped due to numerous Major Events which impacted the completion of work.  For example:

- Multiple Water Events Dating Back to 2016

- Lack of vertical transportation for material & tradesmen & women.

- Failure of Porte-Cochere.

67.     All of these have impacted Cobb's ability to be productive and complete its work.

68.     This confusion and inability by Hunt to complete the Project continues to cost Cobb time and money.  Cobb has continually asked Hunt for a completion CPM schedule, so that Cobb can plan its manpower and schedule its remaining work.  To date, Hunt has never supplied such a completion CPM schedule.  As a result, Cobb has had little if any direction from Hunt. Both Cobb and the other subcontractors are operating in a fog, and it is impossible to efficiently coordinate and schedule work on the Project.

69.     Cobb expects that Hunt will try to blame Cobb for this delay in completing the Fairmont Hotel based upon Hunt's past efforts to cast blame elsewhere in an attempt to avoid the natural conclusion that all such delays have been caused by Hunt.  It is undisputed that Cobb is not now on the critical path of completion.  Nor has it been at any time since Hunt's Partial Termination.  In fact, Cobb has never been the cause of any critical path delay on any schedule that Cobb has received.  The failure rests solely with Hunt and its gross mismanagement of the Project.

70.     The Owner of the Fairmont Hotel is desperate to finish the Hotel.  It has reached out to several subcontractors and offered to directly pay the subcontractors to accelerate their

20

work on the Project.  The Owner is clearly dissatisfied with Hunt's inability to manage the Project on time, or at all.  Cobb expects that the Owner will likely initiate a lawsuit against Hunt for its incompetent management of this Project.

## I.    *Damages from poor Project management.*

71.    Cobb has been damaged by Hunt's failure to properly manage and schedule the Project.  In particular, Cobb has suffered, by way of example and not limitation:

    (a)    increased construction labor costs for overtime, additional shifts, and/or manpower;

    (b)    increased equipment maintenance costs and the cost of additional equipment and/or materials;

    (c)    increased costs associated with expediting labor, equipment and material;

    (d)    increased supervision;

    (e)    increased job site expenses and home office expenses directly related to the acceleration effort;

    (f)    loss of inefficiency and productivity;

    (g)    increased costs in relation to the test and balancing work;

    (h)    damages to Cobb's reputation as a result of the improper and unjustified partial termination; and

    (i)    damages and costs due to the involvement of Cobb's surety following the improper partial termination by Hunt.

72.    Hunt's failure to coordinate caused Cobb to suffer a decrease in productivity.  When Cobb executed the Subcontract, it did so understanding and conditioned on the premise that it would be able to complete its work in an orderly and efficient manner per a mutually agreed to CPM construction schedule.  Cobb's pricing was based upon this assumption and determining whether to execute the Subcontract.  Cobb would not have priced its work as it did

21

or executed the subcontract if it knew of the actual job conditions on the Project.  In fact, Cobb would have likely walked away from the opportunity of working on Project if it had known about the incompetent management of the Project or had known Hunt would refuse to provide Cobb with a mutually agreed to schedule.

73.    Cobb's actual productivity on the Project was significantly lower than that historically experienced.  As an experienced mechanical contractor, Cobb has developed work plans and strategies which maximize Cobb's construction efforts.  This has resulted in historical productivity data that is usually highly efficient and profitable.

74.    Cobb was unable to achieve this historic/anticipated/planned production on the Project due to Hunt's failure to properly manage, coordinated schedule the product work.

### Claim – Breach of Contract

75.    Cobb hereby incorporates Paragraphs 88-160 of its Counterclaim as though fully restated herein.

76.    Hunt breached the Subcontract by:

(a)    improperly terminating Cobb's work on the Podium;

(b)    failing to pay Cobb for all of its completed work;

(c)    mismanaging the Project and then making unreasonable demands on Cobb for additional labor, materials, and supervisors;

(d)    failing to coordinate work among subcontractors and provide adequate scheduling and sequencing/coordination of trades;

(e)    failing to establish a mutually agreed upon CPM Schedule;

(f)    failing to properly schedule the work on the Project;

(g)    failing to provide Cobb's workers with adequate sanitary facilities, man hoists, and access to the crane and lifts; and

(h)    failing to comply with its implied duty to cooperate and not hinder Cobb's performance.

22

77.     These breaches hindered Cobb's ability to apply its labor, materials, and equipment in a cost-effective and productive manner as planned and contracted.   Hunt's mismanagement, demands, and material unilateral changes to the Subcontract caused Cobb significant damages, presently in excess of $8 million.

### Claim – Request for Declaratory Relief

78.     Cobb hereby incorporates Paragraphs 88-163 of its Counterclaim as though fully restated herein.

79.     Cobb seeks a declaration of its rights under the Subcontract.   Specifically, Cobb requests a declaration that Hunt's partial termination of Cobb was improper under the Subcontract, and an award of all associated damages.

### Claim - Attorney's Fees

80.     Cobb hereby incorporates Paragraphs 88-165 of its Counterclaim as though fully restated herein.

81.     The Subcontract states that the "prevailing party" in any lawsuit between the Parties is entitled to "all of its attorney's fees, disbursements or costs as defined in Section 33.6 incurred in connection with the prosecution or defense of the dispute."   Cobb seeks reimbursement for all of Cobb's "attorney's fees, disbursements or costs."

### Conditions Precedent

82.     Cobb has satisfied all conditions precedent for pursuing and recovering on its claim and for the recovery of its reasonable and necessary attorneys' fees.

HOU 408769952v1

Respectfully submitted,

**Greenberg Traurig LLP**

By :  */s/ Michael L. Burnett*
    Michael L. Burnett
    Greenberg Traurig, LLC
    State Bar No. 03428700
    1000 Louisiana Street, Suite 1799
    Houston, TX 77002
    Telephone :  (713) 374-3580
    Facsimile:  (713) 374-3505
    *burnettm@gtlaw.com*

    **ATTORNEYS FOR DEFENDANT COBB**
    **MECHANICAL CONTRACTORS, INC.**

## CERTIFICATE OF SERVICE

   I hereby certify that this Response was electronically filed with the Court and that counsel of record, who are deemed to have consented to electronic service in the above referenced case, are being served this 12th day of February 2018, with a copy of the above document via the Court's CM/ECF System.

        */s/ Michael L. Burnett*
        Michael L. Burnett

24