# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC. | § | |
| | § | |
| VS. | § | NO. A-17-CV-215-LY |
| | § | |
| COBB MECHANICAL CONTRACTORS, | § | |
| INC., and LIBERTY MUTUAL INS. CO. | § | |

## ORDER

Before the Court are Hunt's Motion to Compel Cobb Mechanical Contractor, Inc., to Answer Interrogatories (Dkt. No. 97); Hunt's Motion to Compel Defendant Liberty Mutual Insurance Company to Answer Interrogatories (Dkt. No. 102); and Hunt's Motion to Compel Liberty Mutual to Produce Documents (Dkt. No. 104); as well as the associated responses and replies (Dkt. Nos. 99, 101, 106, 109-111, and 114).

## I. FACTUAL BACKGROUND

This case involves a claim by Hunt Construction Group, Inc., the general contractor for a hotel project in Austin, Texas, against Cobb Mechanical Contractor, Inc., related to Cobb's work as the plumbing and HVAC subcontractor on that project. Hunt contends that Cobb fell behind on its work, which was causing delays and problems on the project as a whole. Hunt eventually terminated Cobb's subcontract as to a significant portion of the project (referred to as the "Podium" portion of the hotel), and replaced Cobb with a new subcontractor. Hunt also made a claim on the performance bond provided by Liberty Mutual Ins. Co., which insured Cobb's performance of its subcontract. Liberty ultimately denied that claim, and refused to provide a substitute subcontractor or to pay for the subcontractor retained by Hunt. This suit against Cobb and Liberty followed.

Hunt has filed three motions seeking to compel Cobb and Liberty to respond more fully to discovery Hunt served on them. As to Cobb, Hunt complains of Cobb's summary response to three

interrogatories seeking to discover the facts supporting the counterclaim Cobb filed against Hunt. As to Liberty, Hunt contends it has failed to provide responsive answers to several of Hunt's interrogatories, and has also wrongly objected to producing documents relevant to Hunt's claim.

## II. LEGAL STANDARD

The fundamental rule of discovery is set out in Rule 26:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

FED. R. CIV. P. 26(b)(1). A party may move for an order compelling disclosure or discovery after attempting in good faith to obtain discovery without court action. FED. R. CIV. P. 37(a)(1).

## III. ANALYSIS

**A.  Hunt's Motion to Compel Cobb to Answer Interrogatories (Dkt. No. 97)**

Hunt is suing Cobb for, among other things, breach of contract, primarily based on the assertion that Cobb failed to meet the scheduling requirements of the parties' subcontract. Cobb has counterclaimed, alleging Hunt's own mismanagement of the project was the cause of Cobb's delays. In an attempt to discover the facts supporting Cobb's counterclaim, Hunt served three interrogatories on Cobb asking that Cobb identify a number of details related to the delays and disruptions Cobb alleges Hunt caused it, including:

- precisely what work was delayed or disrupted by Hunt's actions;
- when Cobb intended to start any delayed work and when it actually started;
- the identity and locations of any "disruptions;"
- when the disruptions occurred;
- how many employees were allocated to the disrupted work;
- which trades were impacted;
- the costs Cobb incurred as a result; and

- how those costs were calculated.[1]

Cobb responded with a 7-page narrative answer, along with a statement that responsive material could be found in specific Cobb Daily Reports, certain Project Documents, and correspondence, all of which Cobb identified by Bates number. Hunt did not believe this response was adequate, and after failing to resolve the disagreement after several conferences with Cobb, it filed this motion to compel. Cobb contends that, with regard to Interrogatories 1 and 2, its 7-page narrative response along with the identified records, responds fully to those two interrogatories, and meets the requirements of the Rules. As to the Interrogatory 3, Cobb alleges it is not obligated to state a specific damage figure at this time, and it may defer its response until it gathers further information and its damage expert has prepared a report.

The Court agrees that Cobb's narrative response is not adequate, as it fails to respond to most of what Interrogatories 1 and 2 ask, and mainly contains general statements without the specifics requested. Cobb is suing Hunt, alleging Hunt's mismanagement caused Cobb's own work to be delayed or disrupted, and is seeking $8 million in damages. Dkt. No. 69 at ¶ 77. This case has been on file for more than a year-and-a-half. Interrogatories 1 and 2 reasonably seek the factual detail of Cobb's counterclaim, details that are plainly discoverable. Cobb's real complaint with providing the specifics the interrogatory requests seems to be that it shouldn't have to provide the kind of methodical detail Hunt is asking for, and its narrative answer with the identified documents is sufficient. The Court disagrees.

Hunt uses one aspect of Cobb's response to demonstrate the failure of Cobb's answer, and that example is instructive. It relates to what Cobb alleges were problems with the "buckhoist" on

---

[1] The full text of the three interrogatories is contained in an appendix to this order.

the jobsite, which Cobb contends contributed to the delays alleged in its counterclaim. In its narrative answer, Cobb stated:

> One or both cars of the buckhoist were consistently breaking down throughout the life of the Project. Cars would stall on floors for days. To see dozens of tradesmen waiting at the bottom of the building to perform their work was the norm, and inspectors would often leave the jobsite rather than wait for the buckhoist to reach the lobby floor. The loss of productivity from hoist delays for all trades was staggering and cannot be understated, particularly for Cobb and other trades working in the upper floors. At no point were these significant delays acknowledged on the Hunt Project schedule.

Dkt. No. 97-2 at 9. Hunt notes that, "from the narrative we learn that the buckhoist stalled 'for days' and that breakdowns were 'the norm' and that the productivity loss was 'staggering' and that inspectors would 'often' leave the jobsite rather than wait." Dkt. No. 101 at 3. As Hunt notes, "Those are stories, not facts." *Id.* That is exactly correct. While it might make a good closing argument, this narrative fails to actually state what delays were caused by buckhoist problems, precisely when those occurred, and what the end result of the delays were—facts Cobb will have to prove at trial to prevail on its counterclaim. Hunt is entitled to ask for these details. Hunt's counsel is merely doing what competent counsel does when faced with a claim like Cobb's counterclaim—ask for the "what, where, when, why" of that claim, so Hunt can be prepared to respond in kind at trial.

The subcontract at issue had a price tag north of $31 million. Both Hunt and Cobb used sophisticated scheduling software to keep track of minute details of the work on the hotel. Given Cobb's $8 million counterclaim, it is not asking too much to require Cobb to state with specificity the work it contends was delayed or disrupted, along with all of the particulars Hunt has requested. If Cobb chooses not to, or cannot, provide more detail than it has to date, that is fine, but it will mean Cobb will be precluded from presenting anything more than those same vague facts to the jury to

4

support its claim. In short, any fact Cobb intends to offer at trial to support the claim that it suffered delays and disruptions caused by Hunt's mismanagement must be included in response to Interrogatories 1 and 2. *See* FED. R. CIV. P. 37(c)(1) (if a party fails to disclose requested information "the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is harmless").

With regard to Interrogatory 3 Cobb asserts that it cannot answer the question as asked, because the financial effects of the delays were cumulative, and the interrogatory asks for an itemization of damages that cannot be itemized. Additionally, Cobb asserts it properly offered to supplement with expert testimony as to damages. The Court agrees that Cobb may defer its answer to this interrogatory to its damage expert. At the time of its response Cobb had not yet served an expert report, but by now that expert report should have been served. *See* Dkt. No. 58 at ¶ 4 (expert report deadline for parties asserting affirmative claims was July 13, 2018). By now Cobb should know what it is claiming in the way of damages, how it calculated those damages, and which specific instances of delay or disruption it ties these damages to. Accordingly, it must respond to this interrogatory at this time, or point to an expert report that provides that information.

In sum, the Court **GRANTS** Hunt's Motion to Compel Cobb Mechanical Contractor, Inc. to Answer Interrogatories (Dkt. No. 97) as set forth above.

**B.      Hunt's Motion to Compel Liberty to Answer Interrogatories (Dkt. No. 102)**

Hunt also complains about Liberty's responses to five interrogatories Hunt served on Liberty. Hunt contends Liberty's objections to these interrogatories were improper, and to the extent Liberty purported to respond, it did so in generalities that do not provide the requested information. Hunt further complains that Liberty refused to confer with Hunt to attempt to resolve the problems.

Liberty responds that its responses were not incomplete or evasive, and that Hunt bears the burden of proving that they were.

There are a number of problems with Liberty's response. First, it was filed on September 17, 2018, a week late. Local Rule CV-7(e)(2) requires that a "response to a nondispositive motion shall be filed not later than 7 days after the filing of the motion." If no response is filed within 7 days, "the court may grant the motion as unopposed." *Id.* On that basis alone the Court could grant Hunt's motion. Further, Liberty bases its entire response on its incorrect view that the burden of proof on the motion lies on Hunt. The case law, however, holds otherwise. The "party resisting discovery must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *McLeod, Alexander, Powel & Apfel v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (quoting *Josephs v. Harris Corp.*, 677 F.2d 985, 991-92 (3rd Cir. 1982)). As Magistrate Judge Horan of the Northern District of Texas recently noted,

> the [2015] amendments to Rule 26(b) and Rule 26(c)(1) do not alter the basic allocation of the burden on the party resisting discovery to—in order to prevail on a motion for protective order or successfully resist a motion to compel—specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable.

*Areizaga v. ADW Corp.*, 314 F.R.D. 428, 436 (N.D. Tex. 2016) (citations omitted). Liberty's conclusory response fails to meet its burden of demonstrating a valid objection to the discovery.

On the merits of its arguments, Liberty's response also fails. Interrogatory 2 asked Liberty to identify all investigations and evaluations conducted by Liberty or on Liberty's behalf to assess Cobb's performance, and requests for any investigation or evaluation, the dates during which it was conducted, the methods used, the conclusions reached, and any documents relied on to reach those conclusions. After objecting that this "encompasse[d] anything and everything ever done by

Liberty," Liberty then provided a conclusory statement that it had conducted a formal investigation and had retained consultants, identified two of those consultants, and stated that one of them (Lin Heath) produced a report. Though the response "incorporates" that report, and though Liberty provided a report to Hunt in 2017, the interrogatory response fails to identify it by Bates number or otherwise, preventing Hunt from knowing whether Liberty is in fact referring to the same Heath report Liberty provided to Hunt in 2017. Liberty is obligated to identify the report it mentions in its response by Bates number or in some fashion that is unique to that document. Liberty is further obligated to identify the materials Heath reviewed in preparing the report, information that is not in its response. Moreover, Liberty's response to Interrogatory 2 fails to state whether the investigation conducted by Heath is the sole investigation Liberty completed. The circumstantial evidence suggests otherwise, in that Liberty lists another consultant in its answer, and the Court is aware from the early hearings in the case that Liberty sought and was granted access to the construction site for several months *after* Heath's report was created. *See* Dkt. No. 31. The Court therefore will order Liberty to answer Interrogatory 2 in full.

Interrogatory 3 asks Liberty whether it had concluded by November 17, 2016, that Cobb would be able to perform its subcontract obligations in time for the project to be completed by August 9, 2017 (the completion date Hunt had scheduled at that time – *see* Dkt. No. 66 at 16 ¶ 44). Whether the answer is "yes" or "no," Hunt asks Liberty to identify the facts it considered and information it used to reach its conclusion. Liberty's response fails to answer much of what the interrogatory asks. First, the answer is at best confusing, and at worst contradictory, as to whether Liberty reached a conclusion regarding Cobb's ability to complete its work by the deadline. At one point, Liberty states that "Cobb had the resources to perform its Work in time to achieve Project

7

completion by August 9, 2017," but then it states that "Liberty did not make any such specific conclusion one way or the other." Liberty cannot have it both ways. It must state whether it made an assessment of Cobb's ability to achieve completion by the August 2017 date. If it did not make an assessment, then it must say so. If it did make an assessment, then it must state what its conclusion was. Further, the response wholly fails to provide the facts and information Liberty considered in its analysis. Instead, Liberty's response states only

> [t]his is a voluminous request. Schedules / Cobb manpower records / NPCI direct observations / Correspondence / NPCI preliminary manpower analysis report regarding sanitation / Buckhoist management are examples.

Dkt. No. 106-1 at 7-8. The rules are clear—if Liberty is going to rely on documents already produced to respond to the interrogatory, it must identify them with specificity. The above is woefully short of that standard.

Interrogatory 5 focuses on a statement in Liberty's answer and counterclaim, in which Liberty alleges that Hunt failed to provide Liberty a meaningful opportunity to perform Cobb's subcontract obligations, or to mitigate the damages caused by any breach by Cobb. Liberty alleges that Hunt's hiring of The Brandt Companies, "on a time and materials basis, to take over work on the podium . . . significantly escalate[d] damages." Dkt. No. 73 at 14 ¶ 131. In Interrogatory 5, Hunt asks Liberty to identify any alternatives to Hunt's hiring of Brandt that Liberty considered, along with a statement of any estimate Liberty made of the cost differential between Hunt hiring Brandt and any alternative, the method used to make any estimate, and the documents relied on in making the estimate. Rather than answer the question, Liberty effectively responded that Hunt should know the answer: "As an experienced contractor, Hunt is aware of alternatives to a time and material basis including hard bid, CM, CM at risk, and not to exceed." This is not responsive. Liberty must state whether it

8

considered any alternatives to Brandt. If it did,[2] then it must state whether it made an estimate of the cost differential between the alternative and the cost of Brandt completing Cobb's portion of the podium, and explain how it made that estimate and what documents it relied on to make it.

Finally, in Interrogatory 7, Hunt asks whether Liberty conducted any evaluation of Cobb's ability to perform under the subcontract before it issued the bond. Liberty responds that it conducted its "traditional underwriting activities," and that it was familiar with Cobb's management and business over "a period of years" and through "various projects." Hunt complains that the response is too vague, and given Liberty's assertion that Hunt was wrong to declare Cobb in default, Liberty must be required to provide a more detailed response, including identifying whether Liberty is aware of any other claims made on bonds insuring Cobb's performance. The Court agrees. Liberty must identify with more specificity what its "traditional underwriting activities" entailed, including what documents or other information it relied on in deciding to issue the bond here, as well as any prior claims against Cobb Liberty is aware of.

In sum, Hunt's Motion to Compel Defendant Liberty Mutual Insurance Company to Answer Interrogatories (Dkt. No. 102) is **GRANTED** as set forth above.[3]

---

[2]Cobb may in fact have done so, as the response includes the statement that "[a]lternatives included Cobb completing which involved Hunt needing to meet, to eliminate impediments and to address changes set forth by Cobb. Another alternative would have been for Hunt to supplement the Cobb forces and manage such supplemental activity." Dkt. No. 106-1 at 9. It's not clear if these are merely hypothetical alternatives Liberty is only now identifying, or whether Liberty actually considered these alternatives when Hunt terminated Cobb.

[3]Interrogatory 6, which asks for the details of any damages Liberty seeks from its breach of contract claim, may well become moot. In a Report and Recommendation issued on October 18, 2018, the undersigned recommended that Liberty's breach of contract claim be dismissed, as Liberty does not have any legal right to seek affirmative relief from Hunt under the surety bond. If that R&R is adopted, then this interrogatory would no longer be relevant. The Court therefore defers any ruling on the motion to compel a response to it at this time.

### C. Hunt's Motion to Compel Liberty to Produce Documents (Dkt. No. 104)

Third, Hunt moves to compel Liberty to produce documents responsive to Hunt's Request Nos. 1-7, 9-19, 21, and 22-35. Hunt's motion explains that Liberty has produced a relatively tiny number of documents, half of which do not include the material called for by the Court-approved ESI Protocol. Moreover, Hunt notes that Liberty failed to produce at least 60 documents that are known to exist—communications between Liberty and Cobb that Cobb produced in its responses, but which Liberty did not produce. Needless to say, the absence of these documents suggests there may be many other deficits in Liberty's production. In addition, Hunt points out that from the metadata information, it knows that Liberty has not produced a single document authored by Luke Bissell, Liberty's primary point of contact for both Hunt and Cobb related to Hunt's claim on the bond—the primary issue in the litigation between Hunt and Liberty. These facts suggest that Liberty has failed to properly search for, and produce, documents responsive to Hunt's requests.

Liberty exacerbates this situation by its cavalier response to the motion to compel. It filed a two-page opposition that fails to acknowledge most of what was just pointed out. It also filed a one-page surreply that adds absolutely nothing to the discussion. The entirety of that filing is a denial that its response to the motion to compel admitted any deficiencies, and the bald statement that "in accordance with the Federal Rules of Civil Procedure and eDiscovery Protocol, [Liberty] has produced all responsive documents, and has affirmed that no non-privileged, responsive materials are being withheld on the basis of any objections. Accordingly, there is nothing to compel production of." Dkt. No. 114. This is not only unhelpful, it ignores the obvious failures of Liberty's response.

As Hunt demonstrates in its motion, Liberty wholly failed to produce at least 60 emails that were sent between Liberty and Cobb. We know this because Cobb produced the emails. Liberty

completely ignores this problem in its pleadings, pretending it doesn't exist—that is, unless its comment that "Liberty reminds the Court that it has no duty to re-produce documents that Hunt already has," was intended to address these emails. But if so, the principle Liberty purports to "remind" the Court of is non-existent. No party is allowed to withhold production of responsive material simply because it believes another party will produce the same material. There are many reasons for this, not the least of which is that the metadata associated with Liberty's version of the Cobb emails may be relevant, and would not be the same as that associated with Cobb's production. Or, if Liberty's copies of the emails no longer exist because they were intentionally deleted, that too would be extremely relevant. Similarly, the complete lack of *any* documents authored by the Liberty employee who took the lead in dealing with Hunt's bond claim is very concerning, and nothing Liberty has said in response to Hunt's motion lessens the Court's concern. On top of this, Liberty's counsel effectively refused to confer in any constructive way with Hunt to resolve the obvious deficiencies in Liberty's document production. The bottom line is that Liberty's response to the motion to compel is woefully inadequate, and leads the Court to conclude that Liberty is not taking its discovery obligations seriously. The Court simply cannot allow this to continue, as the Rules of Civil Procedure do not work if counsel and parties do not take their discovery obligations seriously.

The Court will therefore **GRANT** Hunt's Motion to Compel Liberty Mutual to Produce Documents (Dkt. No. 104) in full. Other than any claim of attorney/client privilege or work product, all of Liberty's objections to Hunt's requests for production are **OVERRULED**. Liberty is **ORDERED** to make a detailed and thorough review of all of its records, and to produce *all* responsive documents regardless of whether it believes Hunt already has a copy of a responsive document, as to each of Hunt Requests 1-7, 9-19, 21, and 22-35. This includes producing all of the

file materials from Liberty's consultant, NPCI, and all of the materials NPCI created or reviewed in preparing its report(s) for Liberty; any records or photographs made by Liberty, NPCI, or any other consultant during the bi-weekly inspections it demanded and was granted at the outset of this case; and Liberty's surety claim file for the Bond, including its non-privileged internal and external communications. (This list is not intended to be exhaustive, and all responsive documents to the requests listed above must be produced.) If Liberty no longer has in its possession identified documents known to exist (e.g., the Cobb emails) or does not have any documents authored by Luke Bissell, it shall provide Hunt with a sworn statement, signed by a Liberty representative so stating, and explaining why it does not have those documents. As noted, the Court will not tolerate the attitude toward discovery obligations shown by Liberty and its counsel on these motions. Any continuing failures will be met with appropriate monetary or other sanctions. *See* FED. R. CIV. P. 37(b)(2)(A). To ensure that this message is delivered to Liberty, counsel for Liberty is **ORDERED** to provide a copy of this order to Liberty's primary representative responsible for this litigation.

**IV.**

For the reasons set forth above, Hunt's three Motions to Compel (Dkt. Nos. 97, 102, and 104) are **GRANTED** as set forth in detail above. It is **FURTHER ORDERED** that the parties produce all discovery materials required by this Order by **November 30, 2018**.

SIGNED this 25th day of October, 2018.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **HUNT CONSTRUCTION GROUP, INC.** | § | |
| | § | |
| **VS.** | § | **NO. A-17-CV-215-LY** |
| | § | |
| **COBB MECHANICAL CONTRACTORS,** | § | |
| **INC., and LIBERTY MUTUAL INS. CO.** | § | |

## APPENDIX

**Interrogatories served by Hunrt on Cobb:**

1. Identify any and all Project Systems and Cobb Work Activities that Cobb claims were Delayed during the Project. For each System and Activity You identify in answering this Interrogatory:

   a. State all reasons for the Delay;
   b. Identify the As-Planned start date and completion date upon which Cobb intended to start and complete the System or the Activity;
   c. Identify the Document upon which Cobb relies in answering part (b) of this Interrogatory;
   d. Identify the dates upon which Cobb actually started and completed each Delayed System and Delayed Activity; and
   e. Identify the Document(s) upon which Cobb relies in answering part (d) of this Interrogatory.

2. Identify with specificity any and all Work and Work Activities that Cobb claims were Disrupted in any way and for any reason.\*\* For each item of Disrupted Work and Disrupted Work Activity You identify in answering this Interrogatory, describe the Disruption and the claimed impact thereof as follows:

   a. State the nature, character, and reason for the Disruption and why Your Work or Work Activity was Disrupted;
   b. Identify the location (Podium or Tower, Floor or Level, Unit and Room, and Gridline Intersection) within the Project that each Disrupted Work and Work Activity was taking place;
   c. State whether the Disruption resulted in a Delay to each of the following: (i) the Disrupted Work or Disrupted Activity or (ii) other work or activities. If the Disruption delayed other work or activities, Identify the other work and/or activities that were impacted;
   d. State the date the Disruption started and the duration of the Disruption to the Work or Activity;

e. Identify all Documents upon which Cobb relies in answering part (d) of this Interrogatory;
f. Identify and quantify all Cobb Resources that Cobb had actually allocated to the Disrupted Work/Work Activity at the time the Disruption first occurred;
g. Identify all Documents upon which Cobb relies in answering part (f) of this Interrogatory;
h. Identify each Cobb Trade and the respective number of Cobb workmen whose activities were Disrupted;
i. Quantify any change or difference in the Productivity of Cobb's work force that resulted from the Disruption versus the Productivity Cobb anticipated according to its "detailed analysis of the necessary labor, materials, and supervisors required for the plumbing and mechanical systems in the Project" Cobb alleges to have prepared in paragraph II.A.5. of its Second Amended Counterclaim (ECF Dkt. 69) or any other Productivity estimate; and
j. State the method by which Cobb calculated or otherwise measured any change in Productivity associated with the Disrupted Work/Work Activity as stated in Your answer to part (i) of this Interrogatory.

3. For each instance of Delay, Disruption, and other instance of wrongdoing or fault that Cobb attributes to Hunt and for which Cobb claims damages in this Lawsuit:

   a. State the monetary amount of damages that You calculate(d) to have been caused to Cobb by each Delay, Disruption, or other instance of wrongdoing or fault on the part of Hunt;
   b. Identify the mathematical formula(e), including all input and assumptions, used to calculate each sum;
   c. Identify all authoritative publications which Cobb relies upon to establish the method and formula(e) by which each sum was calculated as legitimate, customary, or proper; and
   d. Identify any and all Documents, records, publications, and texts used as a source of any input, including values, constants, other numbers, or dates, to perform each calculation.